# CASES DETERMINED

IN THE

# SUPREME COURT OF NEBRASKA

## SEPTEMBER TERM, 1913.

STATE, EX REL. EDWARD GUNNARSON, APPELLEE, V. NEBRASKA CHILDREN'S HOME SOCIETY ET AL., APPELLANTS.

FILED SEPTEMBER 26, 1913. No. 17,235.

1. **Habeas Corpus: VENUE: CUSTODY OF CHILD.** An application for a writ of habeas corpus by a parent to recover the possession of his minor child may be brought in the district court in the county where the unlawful detention takes place. Whether it may also be brought in the county where the relator resides is not decided.

2. **Parent and Child: SURRENDER OF CUSTODY OF CHILD: REPUDIATION OF AGREEMENT.** A father can, by his agreement in writing, surrender the custody of his infant child to another, so as to make the custody of that other legal, and he cannot thereafter repudiate such agreement and retain the custody of his child, unless he can show a clear breach of the agreement, or an abuse of the child, or that the best interest of the child requires it.

3. ——: **CUSTODY OF CHILD: EVIDENCE.** Evidence examined, its substance stated in the opinion, and *held* that it is for the best interest of the child to remain in the custody of the respondents.

APPEAL from the district court for Madison county: ANSON A. WELCH, JUDGE. *Reversed and dismissed.*

*Allen & Dowling* and *Baldrige, De Bord & Fradenburg,* for appellants.

*H. Halderson* and *M. B. Foster, contra.*

(255)

BARNES, J.

This was a proceeding in habeas corpus brought in the district court for Madison county by the relator, Edward Gunnarson, to recover the possession of his two minor children, Olga Gunnarson and Ellen M. Gunnarson. A trial resulted in an order giving the custody of Ellen M. Gunnarson to the relator, and remanding the custody of Olga to the respondents. From that judgment the respondents have brought the case to this court by an appeal.

It appears that the relator, on or about the 18th day of March, 1910, by an instrument in writing, duly signed and acknowledged before a notary public of · Madison county, relinquished the care and custody of his two daughters to the respondents, who took them, without objection on his part, to Omaha, in Douglas county.

It is respondents' first contention that the action should have been commenced in Douglas county, and the district court for Madison county had no jurisdiction in this case to make the order of which the respondents complain. It is argued that the action should have been commenced in the county where the unlawful restraint took place, and some of the authorities seem to sustain that contention. Whether it may also be commenced in the county where the relator resides has not perhaps been determined by this court, but we deem it unnecessary to decide this question, for the reason that the judgment in this case can well be put upon another ground.

It appears that about five years before the commencement of this proceeding the wife of the relator died, leaving him with the two children in question, one of whom was about a year old, and the other some four years of age; that immediately after the death of his wife the relator placed the youngest child in the charge of a Mrs. Newman, residing in Newman Grove. The eldest girl, Olga, was placed in charge of one Eugene King, where she remained some four or five months, when she was also placed in the charge of Mrs. Newman. That for the period of about four

years the relator also lived in the Newman home. The treatment of the children was such as to cause comment among the neighbors, and in March, 1910, Gunnarson's brother and wife came on a visit to Newman Grove. They found such a condition existing that they notified the officers of the respondent that something ought to be done for the care of the children, and Mrs. Quivey, acting for the respondents, came to Newman Grove, and secured the relinquishment above mentioned, and, without objection on the relator's part, took the children to Omaha. They were afterwards placed in the home of Philip Nichols and Emma E. Nichols, his wife, and in the home of Robert A. Collier and Retta Collier, his wife, at or near the town of Campbell, in Franklin county, Nebraska. At the time the children were taken to Omaha the relator was living in the home of Mrs. Newman, whom, it is apparent from the record, in a few days thereafter he married, and thereupon he filed the application for a writ of habeas corpus to recover possession of the children.

The district court found that there was no fraud, false representations or undue influence used on the part of the respondents to obtain possession of the children. The finding of the court reads as follows: "The court further finds that said instruments (relinquishment papers) in writing were not obtained by fraud, false representations or undue influence on the part of the respondents, or any other person, and that the relator was persuaded to sign the same by persons acting in good faith, who believed that they were acting for the best interest of said children, without false representations on their part." The court, however, found that the instruments were voidable and subject to rescission by the relator, and that on the 19th day of March, 1910, the relator notified the persons in charge of the office of the respondents, the Nebraska Children's Home Society, that he desired to rescind the authority of said instruments purporting to convey to said Nebraska Children's Home Society the custody of the said children, and that he thereby rescinded and canceled his said agreements.

It is a significant fact that the court further found that "the relator has not furnished, and is not able to furnish, proper parental care, custody and control of the said Olga Gunnarson, and is not entitled to the custody of said child." The court further found, however, that "the relator has been, and is able to furnish a home and proper parental control for the said child, Ellen M. Gunnarson, and is a proper person to have the custody of said child, and is entitled to her custody." There was a further finding by the court that "the Nebraska Children's Home Society is a suitable institution to have the control and custody of said children, and that said Robert A. Collier and Retta Collier are suitable persons to have the actual custody of said Ellen M. Gunnarson, and that said Philip Nichols and Emma E. Nichols are suitable persons to have the actual custody of said Olga Gunnarson." It is clear that the findings of the court are somewhat inconsistent.

The testimony shows that it was a matter of common knowledge that the relator lived with Mrs. Newman. He testified: "I lived there at Mrs. Newman's house three years before I signed exhibits A and B. When I was not at home, Mrs. Newman had charge of these little children." A Mrs. Condrim testified, in substance, that she had lived at Newman Grove for about 18 years, and had known Mrs. Gunnarson, the mother of the two girls; that she lived across the corner of the block from Mrs. Newman. She said Mrs. Newman told her that she was a widow, and she testified in regard to a conversation she had with Mr. Gunnarson. In relation to this matter her testimony is as follows: "Well, I don't remember just how we started the talk. He said to me that the girls were not treated right. * * * And I said: 'Are you married to her (meaning Mrs. Newman)?' He said: No; he was not married. I said: 'Well, if you was a decent man you would not live there with your children if you were not married.' I says: 'Why don't you take them away?' He says: 'That is what I should do.' That is about all that was said."

Mr. Nelson, cashier of the bank at Newman Grove, who

knew the Gunnarsons well, testified, in substance, as follows: I had a talk with him after he sent the children to the respondents. I told him it was a pretty hard thing for a father to have to do. He mentioned something—he thought the children would be better off to have a home— something to that effect. People made remarks that relator and Mrs. Newman were not married. I was surprised to learn that they were not married, because I did not think it was quite the proper way for a man to live with his children. Don't know how long they lived there. Relator and Mrs. Newman did not get married until the girls had been sent away. This witness further testified that Gunnarson drank excessively, and that the children were whipped by Mrs. Newman when they lived with her; that the eldest child ran away from home on account of the treatment she had received.

A Mr. Juelson testified that, after the papers were signed, Gunnarson proposed that he get an officer to go along to the house to get the children. One was at home with Mrs. Newman, the other had run away, or had gone into the country some distance, the night before. Gunnarson seemed afraid to go. He said he knew there would be trouble if he went down. Mrs. Quivey went down. Mr. Gunnarson drove out to get the other child.

Mrs. Quivey testified that Gunnarson told her that he went home about 11 o'clock one night, and the children were both out of doors, and were not willing to go into the house, and that made him send for some one to take care of them. He said the younger girl had been treated well, but Mrs. Newman did not like the other one, and treated her cruelly. He said she had whipped her and had hurt her. He said the eldest girl had run away the night before.

Louis Pospicl testified, in substance, that he lived at Newman Grove; was 35 years old, and was a married man; was in the implement business; and lived about 300 or 400 feet from Mrs. Newman; that he knew the children; that he did not know whether Gunnarson was married

to Mrs. Newman or not. He further testified: "I have noticed lots of times that they (referring to the children) were not treated right. Mrs. Newman slapped Olga. I heard lots of hollering between Mrs. Newman and Olga. Mrs. Newman was hollering. I did not know what she said. I know she whipped her with her hand."

Mrs. Pospicl testified: "The little girls did not have any home except Mrs. Newman's; if they had any other I would have known it. Yes; I saw Mrs. Newman whip these children. Yes; snow on the ground; she whipped both of them. She did not whip the little one as much as she whipped the oldest one. She whipped the oldest until she laid down in the snow and hollered. She said: 'Mamma, don't lick me any more.' I called to her. The children were screaming so much I guess she didn't hear me. Yes; it was Olga. She was lying in the snow. I don't know how many times she slapped her. I could not hear just what was said. The sun was going down. She hit her a good many times. She hit her when she was lying in the snow. I said to Mrs. Newman: 'What are you doing?' I went in, and did not see her any more. I have heard the children scream over from the house. I have heard it so many times I do not know." On cross-examination the witness testified: "I do not know what Mrs. Newman whipped the girls for that day. No; I didn't see Olga shortly after the whipping, nor for some time later. I don't know whether there were any marks on the girl from this whipping."

Mr. Gutru, who is in the hardware business at Newman Grove, testified in regard to the treatment of the children. He said: "I knew the little girls quite a long time before they were sent away. They came to my house and got in with my children. As I understand it, they had been driven out of the house. My wife tried to send the children home when supper time came, but she couldn't get rid of them. She called me up at the store, and wanted me to look after the children and get them away, because she didn't want to get into any trouble, so I set out to find

Mr. Gunnarson, and took him down and asked him to go and get the girl. * * * He said he would, and started off. Some other gentlemen informed me that Gunnarson went down and inquired, and said he would punish the girl, so I started right home. I didn't want any trouble at my place. * * * We talked a little while, and he said, 'We had better get the girl and take her home,' and we found the girl had lit out—had gone out the back door, and was gone. I don't know where she went to. * * * Well, I can't say that he was particularly under the influence of liquor. I know that he is in the habit of getting drunk very often. One day the two girls came with my girl from the schoolhouse, and would not go home. They wanted my girls to go home with them, and said, 'They will not whip me if you go with us.' * * * The same day my children went up town to find Gunnarson; and they had walked around on the streets, and Mr. Gunnarson and the two children came into the store. They stopped there, and we got to talking of the girl. * * * Mrs. Newman had accused her of telling lies, and that she had punished Olga and whipped her, and washed her mouth to wash the lies out of her mouth. Gunnarson said he couldn't be there. He said they were whipped or mistreated, and he said that is too bad that they were treated that way. He says, as near as I remember, that they tell lies, or something like that, and he knew that was one of the punishments they received for telling lies." Testifying of Gunnarson's general reputation in the community, he stated: "He is in the habit of getting drunk. I would not say that he is the worst drinker in Newman Grove * * * is right with the drinkers. Olga didn't tell that she was punished by putting soap in her mouth at my house. She told it out in the street before Mr. Gunnarson and myself. I had very good reason to believe it. The girl cried, and didn't dare to go home. * * * We had quite a little talk with Gunnarson about this matter. He seemed to be in trouble himself to know where to take the children. He was apparently afraid to take them

home himself. No; I didn't talk with him about a plan, for I didn't know of any plan, * * * to take care of them."

John Juelson, a reputable business man of Newman Grove, testified that he knew the people very well; that Gunnarson's general reputation in the neighborhood was that he drank pretty hard.

Lillian McClelland testified for the respondents that she was at the Children's Home Society when Gunnarson came to see about reclaiming his children. Her testimony, in substance, is as follows: "When he came there I was alone. I should say he was intoxicated. Yes; I have seen enough of intoxicated men to know when they are intoxicated. I had a talk with him with reference to the children. He said he came to see Mrs. Quivey. I told him Mrs. Quivey was out of the city, and would not be able to see him before the first of the following week. He said he had a letter from Mr. Quivey that he had written. I said: 'Why did you give your children up, if you wanted to have them back again?' He said he didn't really want to give them up, but he had been living with Mrs. Newman for five years. He said he did not believe it was the right place for the children, but he wanted them back." On cross-examination she testified: "It was about 2 o'clock in the afternoon that Gunnarson appeared at the office. Yes, sir; he must have come directly from the depot to the office. Yes; he was drunk. Well, he lay over the register and vomited; acted as much like a drunk man as I ever saw. I never saw him but twice; that is all I know about his drinking."

Miss Carrie Stewart testified, in substance, as follows: "I don't think I ever was at Newman Grove before that case came up. It was in my judgment a case that required attention. Yes; I have seen Mr. Gunnarson. First about January 6, 1910, at Newman Grove on a coach attached to the freight train. He came in and sat down just back of me. From his remarks I judged he was intoxicated. Shortly after I took my seat in the car, Mr. Gunnarson

**came** on with two little girls; was sitting just back of me, and they sat there for a short time. He seemed to be so much intoxicated that he could scarcely resist Mrs. Newman, and she took the two little girls and got off the train and went across the railroad track. She was scolding the eldest girl."

There is considerable other testimony in the record showing, or tending to show, that Gunnarson was a man addicted to the use of intoxicating liquors. It seems clear from the testimony that Gunnarson himself knew that his children had been cruelly treated by the woman he was living with. It also seems clear that she had no affection for the children of Gunnarson's first wife; that her conduct towards them drove them away from home; that they were subjected to frequent punishment in the way of whippings. If she would do this while the children were living there, before they were taken in charge by the respondents, it is fair to assume that she would continue this cruel treatment in case they were returned to the custody of the father.

A father can, by agreement, surrender the custody of his infant children to another, so as to make the custody of that other legal, and he cannot thereafter repudiate such agreement and retain the custody of the children, unless he can show a clear breach of the agreement, or an abuse of the child, or that the best interest of the child requires it. *Cunningham v. Barnes,* 37 W. Va. 746; *Anderson v. Young,* 54 S. Car. 388.

In *Clark v. Bayer,* 32 Ohio St. 299, it was said: "It sometimes happens that parents have abandoned their minor children, or by act and word transferred their custody to another. In such cases, where the custodian is, in every way, a proper person to have the care, training, and education of the infant, and the court is satisfied its social, moral, and educational interests will be best promoted by remaining in the custody of the person to whom it was transferred, or received, when abandoned, the new custody will be treated as lawful and exclusive."

In *Bonnett v. Bonnett,* 61 Ia. 199, it was said: "The weight of authority, we think, sustains the position that a parent can by agreement surrender the custody of his child, so as to make the custody of him to whom he surrenders it legal."

In view of the finding of the trial court that Robert A. Collier and Retta Collier are suitable persons to have the actual custody of Ellen M. Gunnarson, we see no reason why that custody should be transferred again to the father, who voluntarily relinquished it. It has always been held by this court that the interests of the child should be taken into consideration in determining its custody. *In re Burdick,* 91 Neb. 639; *State v. Porter,* 78 Neb. 811; *In re White,* 33 Neb. 812. As we view the record, it is apparent that it is for the best interest of Ellen M. Gunnarson that she remain in the custody of Robert Collier and Retta Collier until such time as it is shown that a change of custody will materially promote the child's welfare, morally and physically.

The judgment of the district court, so far as the care, custody and control of the child Ellen is concerned, is therefore reversed, and the proceeding is dismissed.

REVERSED AND DISMISSED.

REESE, C. J., LETTON and FAWCETT, JJ., not sitting.