SETH TERRY ET AL. V. J. A. JOHNSON.

FILED APRIL 19, 1905. No. 13,765.

1. **Evidence** examined, and *held* sufficient to sustain the judgment of the trial court.

2. **Habeas Corpus:** CUSTODY OF CHILD. The right of a parent to the custody of a minor child of tender years is not lightly to be set aside, and it should not be done where unfitness is not affirmatively shown or a forfeiture of such right clearly established. *Norval v. Zinsmaster,* 57 Neb. 158, followed and approved.

ERROR to the district court for Gage county: WILLIAM H. KELLIGAR, JUDGE. *Affirmed.*

*E. O. Kretsinger,* for plaintiffs in error.

*Hazlett & Jack, contra.*

OLDHAM, C.

On February 16, 1904, J. A. Johnson filed his petition for a writ of habeas corpus in the district court for Gage county, Nebraska, to recover possession and custody of Beulah Johnson and Effie Johnson, two minor daughters of the petitioner, alleging that the respondents, Laura Terry and Seth Terry, the grandparents of the children, and Menzo W. and Edgar M. Terry, uncles of the children, unlawfully restrained them of their liberty. Respondents, by way of return to the writ, alleged, in substance, their relationship to the children and that the petitioner was an unfit person for the care and custody of the children. That, after the death of the mother of the children, the relator, after having taken insufficient care of his daughters, Beulah and Effie, brought them to the home of their

grandparents in Gage county, Nebraska, and there left the children, where they remained ever since, without any care or attention on his part, and without his aiding in their support, education or maintenance. The return concluded with a general denial, and a prayer that Beulah and Effie might be remanded to the care, culture, nurture and education of their grandparents, and that the writ be discharged. On issues thus joined there was a trial to the court, and a finding that the respondents named in the petition and writ unlawfully deprived Effie Johnson of her liberty, but that as to Beulah Johnson there is no such restraint exercised by any of the respondents. The court further found that the respondents are in all respects suitable and proper people to have the care and custody of either or both of said minors, and that the father, J. A. Johnson, is a suitable and proper person to have the care and custody of Effie Johnson, and adjudged, ordered and decreed that, on the second day after the adjournment of the district school, at which the minor was attending, that the respondents Seth Terry and his wife shall deliver Effie Johnson to her father, and that the custody of said Effie Johnson be awarded to the relator. There are other orders in the decree which are not complained of in either brief, and therefore need not be set out. To reverse this judgment both relator and respondents bring error to this court. Relator complains of the judgment and finding as to the care and custody of Beulah Johnson, and respondents as to the judgment concerning the custody of Effie Johnson.

From a very voluminous record of the evidence offered at the trial of this cause, the following facts material to its proper determination have been gleaned: That the relator, J. A. Johnson, is a farmer residing in Page county, Iowa; that on the 1st day of March, 1887, he was married to Nancy Terry, the mother of the minor children, and resided with her on his farm in Page county until the 24th day of March, 1902, when she departed this life; that at the time of the mother's death, she left surviving

her the two children in dispute, Beulah Johnson, who will be 17 years of age on the 15th day of April, 1905, and Effie Johnson, who will be nine years of age on the 4th day of August, 1905, and a son, Everitt Johnson, who is now 12 years of age; that after the death of the mother the children resided for a short time with their father on his farm in Iowa, and on the 17th day of November, 1902, they came on a visit to their grandparents, near Pickrell, in Gage county, Nebraska; that the son Everitt remained a short time with the grandparents and returned to his father, who subsequently placed him in charge of an aunt residing in Omaha, Nebraska, for the purpose of enabling him to attend the high school in that city. It appears, notwithstanding the almost reprehensible effort that has been made by counsel for each of the contending claimants of the custody of the children in controversy to show otherwise, that up to and at the time of the death of relator's wife the family of relator and the grandparents entertained and cultivated cordial relations with each other; that after the death of the mother the grandparents invited the children to visit and remain temporarily at their home; that the father visited them after their arrival there, was in correspondence with his children, made arrangements to provide for their higher education either in Omaha or Council Bluffs, and always recognized his parental responsibility and moral obligation to provide for their support, maintenance and education. The evidence shows by an overwhelming preponderance that the father is an honest, industrious and thrifty man, who has abundant means and a proper disposition to rear and educate the children. The evidence on the other hand shows that the grandparents are likewise thrifty, industrious, upright people, who are in easy financial circumstances, and are deeply attached and devoted to the children, and proper people, as the court found, for the custody of one or both of them. In other words, the findings of fact of the trial court with reference to the character and reputation of both the father and the grand-

parents clearly reflect the overwhelming weight of the testimony contained in the bill of exceptions. It might be further remarked that the finding of fact that the evidence failed to show that either of the respondents had attempted to restrain or control the action of the elder daughter Beulah in returning to her father is also fully supported by the testimony. The evidence on this branch of the case showed that Beulah acted on her own volition in refusing to return to her father's home, and not from restraint imposed by either of the respondents.

Text-writers on domestic relations are uniform in holding that in determining the custody of a child near the age of maturity the wish of the child, if based on proper information and experience, should be given great weight and consideration; and as it clearly appears from the testimony of Beulah Johnson that she prefers to reside with the grandparents, rather than return to the custody of the father, we think the court was fully justified in refusing to make any order concerning the custody of this child further than to leave her free and unrestricted in any subsequent desire she might have to return to her father before reaching the years of maturity.

With reference to the custody of Effie Johnson, the evidence clearly shows that respondents did seek to assert their rights to the custody of this child, and showed a decided disposition to resist the efforts of the father to take her from them. This, then, presents the question as one of law as to which has the superior right to the custody of a child of tender years, the father of the child or its grandparents, when each is shown to be a proper party for the exercise of such a duty. It is urged by counsel for respondents that only the best interest of the child should be considered, and that the question of the natural right of the parent should be regarded as only of secondary importance. In support of this contention he cites *Sturtevant v. State,* 15 Neb. 459; *Giles v. Giles,* 30 Neb. 624; *State v. Schroeder,* 37 Neb. 571, and *Schroeder v. State,* 41 Neb. 745. The doctrine contended for does

seem to receive some support in *Sturtevant v. State, supra,* in the general and unrestricted declaration used that only the best interest of the child should be considered. Chapter 34 of the Compiled Statutes, 1883, was in force at the time of the decision in *Sturtevant v. State, supra,* and the provision then existing gave the father the first right to the custody of the child. This provision of the statute is criticised in the opinion, and was amended in 1885 by the enactment of section 6, chapter 34, Compiled Statutes, which provides: "The father and mother are the natural guardians of their minor children, and are equally entitled to their custody, and to care for their education, being themselves competent to transact their own business and not otherwise unsuitable. If either dies, or is disqualified for acting, the guardianship devolves upon the other." The general language used in all the above cited cases is explained and qualified in a later and better considered opinion of this court, *Norval v. Zinsmaster,* 57 Neb. 158, in which it is held:

"The statute and the demands of nature commit the custody of young children to their parents rather than to strangers, and the court may not deprive the parent of such custody unless it be shown that such parent is unfit to perform the duties imposed by the relation or has forfeited the right."

The closing sentence of this latter opinion emphatically repudiates the doctrine that a parent has only a secondary interest in the custody and maintenance of his own children, by the clear, ringing closing sentence that, in determining the question of the custody of a child, "the right of the parent is not lightly to be set aside, and it should not be done where unfitness is not affirmatively shown, or a forfeiture clearly established." Generally speaking it is for the best interest of the child that it should be in the care of its natural parents.

It is recorded in Sacred Writ that in the early days of the reign of the wise King Solomon he was called upon to determine the question of the custody of an infant

child claimed by two women from lowly walks of life. The record does not show that in the trial of the cause he had any witnesses summoned to determine which of the applicants could provide the most sumptuous home for the child, or which could array it in the costliest raiment, or offer it the highest social and educational advantages; but the record does show that when by artful strategy he had determined which of the suitors was the real mother of the child, he at once announced an award, which is recorded in the 27th verse of the 3d chapter of 1st Kings, as follows: "Then the king answered, and said, 'Give her the living child, and in nowise slay it; she is the mother thereof.'"

It therefore follows that the judgment of the district court is right in principle, and we recommend that it be affirmed.

AMES and LETTON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.