RALPH LEE ERAVI, APPELLANT, V. CHARLES BOHNERT, APPELLEE.

266 N. W. 2d 228

Filed May 31, 1978. No. 41568.

Joseph J. Cariotto, for appellant.

Richard L. Schmeling, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

WHITE, C. J.

This is a habeas corpus custody controversy between Ralph Lee Eravi, the father of Philip Michael Eravi, age 6, and Charles Bohnert, the brother of Philip's deceased mother, with whom Philip Michael is now living. The District Court, after an evidentiary hearing, placed the custody of Philip Michael in the respondent, Charles Bohnert. We reverse the District Court's decision and direct that the custody of Philip Michael be granted to his father, Ralph Eravi, the petitioner.

Philip Michael was 6 years old at the time of the trial. Although there is some dispute between the parties as to the amount of visitation which the father has had with Philip, and a controversy about his failure to adequately pay child support from February 1973, until September 1974, the essential facts relevant to the determination of this controversy are undisputed. Ralph and Phyllis Jean, the mother, were divorced on July 27, 1972. The mother died suddenly on August 1, 1976. The divorce decree, entered in Moberly, Missouri, awarded custody of the child to Phyllis Jean and ordered

Ralph to pay $10 per week child support. Phyllis Jean and Philip moved to Garnett, Kansas, where Phyllis secured employment and maintained a close relationship with her mother, Mrs. Hartman. Prior to August 9, 1974, Ralph's employment record was uncertain, if not erratic, and his primary occupation was that of a musician. In order to find regular employment, he migrated to California and since August 9, 1974, has been a line driver with Yellow Freight Systems, Barstow, California, and makes between $1,800 and $2,000 per month. He lives in a modern three-bedroom house, remarried on November 14, 1974, the new marriage is stable, his wife is also employed, and they support her 14-year-old son from a previous marriage. His wife can accommodate her working hours so that she would be home when the child comes from school. Although his job requires him to be on call for trucking assignments, he would, on the average, be home 2 or 3 days a week.

There is considerable evidence in the record as to the visitations by Ralph to his son in Kansas, and the contention that he has not established a proper father-and-son relationship with Philip Michael. It is clear that the nature of his job and the distance to his wife's residence prevented an ideal development of the relationship between the father and the son. He has visited his son more than twice, once for a period of 5 days, and has sent him presents each Christmas, and remembered him on his birthdays and at Eastertime. It appears that since August 1974, when he obtained regular employment, he has complied substantially with the support order for his son. The checks in evidence show that instead of paying only the $10 per week, as directed by the court, he raised the payments on his own accord to $50 per month and was catching up substantially upon his previous default in 1973 and 1974. Ralph was on a midsummer visit to the Middlewest in 1976

and, on calling to Phyllis to make arrangements for visiting his son, found out that she had suddenly died. He immediately proceeded to Garnett, Kansas, claimed custody of Philip Michael, and found that Philip Michael had been temporarily sent to Charles Bohnert's residence in Lincoln, Nebraska. He immediately proceeded to Lincoln, Nebraska, contacted the Bohnerts, and requested the custody of Philip Michael. On refusal, he employed counsel and immediately brought this habeas corpus action to recover the custody of his child.

The problem in this case is a rather usual one. After the death of the mother, Philip Michael was sent to his uncle's home. A natural and reciprocal attachment formed. It was, however, of short duration at the time of the trial in October 1976. We are dealing here with a boy of 6 years of age. The personal character and the custodial capacity of the respondent Bohnert, the uncle, and his wife, are undisputed. They have a fine home, a cultured background, and one child of their own. They have the willingness and the disposition to take care of Ralph Eravi's child.

Ralph Eravi, the father, was a complete stranger to the Bohnerts when he appeared in Lincoln to claim custody of his child. Predictively they were skeptical as to the father's background, and their primary concern was the best interests of Philip Michael. But more significantly, they simply felt that they could not deliver Philip Michael to the father unless there was competent proof which satisfied them that he was a fit and proper person and would properly perform the duties of a father toward Philip Michael. On cross-examination, the respondent, Charles Bohnert, testified as follows:

"Q. Well, Mr. Bohnert, it is your position then that that child is better off with you than with his father?

"A. My position is that if it comes down to an

equal home with me or the same, a good home with his father, and if the boy would want to live with his father then I feel that his father would probably be the best one for him if it came down to a choice to having an equal home with him having the same thing what I can provide for him. Whatever is best for the boy is what I am concerned with.

"Q. But you do not want the father to have an opportunity to have his own child; isn't that correct?

"A. That is not what I am saying. * * *

"A. *Well, yes, but am I supposed to turn — let him take the boy home with him without knowing anything about his home or anything?*

"Q. I didn't ask you that question, sir.

"A. Well, all right. Well, under the circumstances we made the decision to keep him at my house." (Emphasis supplied.)

Joyce Bohnert, Charles' wife, testified as follows:

"Q. Do you know whether your husband or anyone in his family has ever asked Mr. Eravi whether he wanted the child?

"A. No.

"Q. Is it your position that the father should be consulted in this matter?

"A. *I think that is what we are doing now.* I don't know exactly what you want me to answer.

"Q. In other words, what you are saying to this Court is that you could *not* make a decision as to whether the father should have the child, that you should *have to come to court* to determine that; is that right?

"A. That's right." (Emphasis supplied.)

It is quite clear from the testimony of the respondent and his wife, that they felt unsure of the reliability of Ralph Eravi to care for Philip Michael. At the same time they clearly recognized his right to the custody of his own child, providing his character and capacity for the job were demonstrated. They knew that Ralph lived in California, and they had no

means at their command or no knowledge upon which to base an informed judgment.

The trial court conducted an exhaustive investigation of both parties. The investigation of Ralph Eravi's home and family situation was conducted through the juvenile court of Lancaster County, Nebraska. In the record is a comprehensive report furnished by the welfare department of the County of San Bernardino, California. This investigation, briefly summarized, is that Ralph Eravi is a 40-year-old man, 6'2" tall, weighing 185 pounds, and in good general health. He is the third of seven children. He completed the 10th grade in school, quit at 16 years of age to go to work, and was in the service of the United States Navy for 4 years from 1955 to 1959. He is employed as a line driver earning $2,000 per month, has been so employed for 2 years and 4 months, his runs are from 8 to 32 hours in length, and he works approximately 55 hours per week. He is off for 8 to 36 hours after a particular run. On psychological testing the conclusion is, "His test reflects he is a well adjusted individual * * *." Nothing in the testing or interview reveals any emotional problems. The conclusion is, "He appears to be a well adjusted person." The results of this examination are the same with reference to his present wife. Psychological testing indicates that both husband and wife see themselves as well-adjusted persons, and the summary states, "The Taylor-Johnson test taken by Mrs. Eravi on herself indicates a well adjusted individual * * *." Nothing in the interviews or the testing indicates any problem in the marriage or the emotional well-being of Esther Eravi. The relationship between Billie Gilmer, the son by a former marriage of Mrs. Eravi, is excellent. The report states: "Billie Gilmer says Mr. Eravi is the greatest. This was said outside the presence of his mother and stepfather and would indicate he has very strong feelings of closeness towards Ralph

Eravi." The conclusion of this report is self-explanatory. It states: "All of the enclosed social data and witnesses' references would indicate this is a very fine family with a good reputation in the community. I can highly recommend this family to the Court as a proper placement for Philip Michael Eravi."

The primary consideration in matters involving child custody, whether arising as a part of the proceedings for dissolution of marriage or otherwise, is that the award of custody should be determined in accordance with the test of what is in the best interests of the minor child. Liebsack v. Liebsack, 199 Neb. 266, 258 N. W. 2d 130 (1977); Bigley v. Tibbs, 193 Neb. 4, 225 N. W. 2d 27 (1975); Kaufmann v. Kaufmann, 140 Neb. 299, 299 N. W. 617 (1941).

Although the facts in this case, as we have noted, are essentially undisputed, counsel, in the briefs, have engaged in a spirited and rather exhaustive argument on the assumption that there is polarized and irreconcilable conflict between the primary custodial right of the natural parent and the primary test of the best interests of the child. It would serve no purpose to review our past cases or attempt to fine hone a reconciliation of the different statements made in our opinions, when applied to the particular facts of those cases. It is true that the language in some of our opinions, when stated out of context of the particular case, would seem to require a choice between a polarized concept of absolute custodial possessory rights versus the overall best interests of the child. We have sought to resolve this apparent conflict by our recent pronouncement in Bigley v. Tibbs, *supra*, that the best interests of the child is the overriding and sole consideration in custodial disputes. In that case we specifically overruled any statements to the contrary in Raymond v. Cotner, 175 Neb. 158, 120 N. W. 2d 892 (1963), and our previous opinions. We have never stated, and do not

state now, that an important and significant consideration in the determination of the best interests of the child is the natural relationship and attachment between a parent and a child. Generally speaking, it is in the best interests of the child that he should be in the care of his natural parent. Terry v. Johnson, 73 Neb. 653, 103 N. W. 319 (1905). The ultimate decision must rest upon a careful evaluation of all the circumstances, considering the natural relationship of the parents to the child, in order to arrive at a conclusion which is in the best interests of the child.

The District Court, in an exhaustive and well-reasoned opinion, compared the two prospective homes and, considering the temporary attachment of Philip Michael to the Bohnerts immediately after the death of Philip's mother, came to the conclusion that the balance tipped in favor of Bohnert. There is evidence to support this conclusion. But as we see this case, it presents a question of law as to who has the superior right to the custody of a child of tender years, the father of the child or his uncle, each of whom is shown to be a proper and capable party for the exercise of such a duty. Assuming that the balance tips slightly in favor of Bohnert, from the economic, social, and cultural standpoint and the temporary attachment of the child, we feel that the long-range best interests of the child rest in placing his custody with his natural father, who also has a fine home and a comparable excellent environment in a moral, social, and economic sense for the proper rearing of his own child. The case presented to us is much stronger for giving importance to the parental relationship than the recent one of State v. Worrell, 198 Neb. 507, 253 N. W. 2d 843 (1977), wherein we said as follows: "Courts cannot deprive a parent of the custody of a child merely because the parent has limited resources or financial problems, or is not socially acceptable, nor because the parent's life style is different or unusual. Neither can a court deprive

a parent of the custody of a child merely because the court reasonably believes that some other person could better provide for the child."

We further observe that the temporary attachment to the Bohnerts' home arose, not out of any failure or neglect on the part of the father, but out of the exigency of the circumstances immediately following the sudden death of the mother and the need for emergency care of this child. There is also evidence in the record that Philip Michael is concerned about his future relationship with his father, if he stays with the Bohnerts. Undoubtedly there will be some trauma, which may not be avoided, in the breaking of the relationship between Philip Michael and the Bohnerts. But the risk of this minimal trauma cannot be equally measured against the importance of developing the momentum of a natural relationship of this boy with his father for the rest of both their lives.

We, therefore, come to the conclusion, and we are required to do so, independent of the trial judge's decision, that the custody of Philip Michael should be awarded to the father, and that the writ should issue. Considering all the circumstances in this case, including the reasoned and responsible position which Bohnert took, we hold that each party should pay his own costs in this court.

REVERSED AND REMANDED WITH DIRECTIONS.