Bonnie Gray et al., appellees, v. Delene Maxwell, John Doe (real name unknown), and Jane Doe (real name unknown), appellants.

293 N. W. 2d 90

Filed June 10, 1980. No. 42609.

James B. Cavanagh of Erickson, Sederstrom, Leigh, Johnson, Koukol & Fortune, P.C., for appellants John and Jane Doe.

Paul L. Douglas, Attorney General, and Lynne Rae Fritz, for appellant Delene Maxwell.

Ronald L. Brown and Maureen Fitzgerald Brown of Brown Law Offices and Teresa Luther of Luther & Beaurivage, for appellees.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, District Judge.

HASTINGS, J.

The relator, Bonnie Gray, brought this habeas corpus action to regain custody of her minor child from the respondents, John and Jane Doe, prospective adoptive parents. The child had been placed with them by virtue of a relinquishment signed and acknowledged by the relator. The trial court found generally in favor of the relator and ordered the child returned to her. The respondents have appealed. Also named as a party and appearing as an appellant in this action is Delene Maxwell, the conciliation court counselor of the District Court for Douglas County, Nebraska. Although Mrs. Maxwell has disclaimed any interest in the ultimate disposi-

tion of this case, she does dispute any findings of the trial court which could be interpreted as finding her guilty of any wrongdoing in this case.

The respondents, Does, have assigned as errors the following actions of the trial court: (1) The reception into evidence of a tape recording of certain telephone conversations; (2) The finding of an agency relationship between the Does and Mrs. Maxwell; (3) The finding of the existence of a transaction for the sale of a child which vitiated the relinquishment; (4) Findings made outside the scope of the issues presented by the pleadings; (5) The finding that reimbursement of medical expenses to the relinquishing mother constitutes consideration for the sale of a child; and (6) A finding that the relinquishment was not valid and not unrevocable. We affirm as modified.

Mrs. Gray was a 25-year-old married woman who, however, was separated from her husband and was in the process of getting a divorce. She had two daughters, the issue of that marriage, and some 8 years earlier had given birth to a child out of wedlock which she had relinquished for adoption. The child involved here was born on June 28, 1978, and was presumably the issue of a live-in arrangement which Mrs. Gray had as a housekeeper for a man who was also in the process of obtaining a divorce, and who had custody of the children of his marriage. As a representative of the court, Mrs. Maxwell had an interest in the welfare of those particular children, and as a result of home visitations, she became acquainted with Mrs. Gray.

According to Mrs. Gray's testimony, Mrs. Maxwell knew of the pregnancy as early as the middle of October 1977, and in January of the following year told the relator that she had a nice family who would like to have the baby. She went on to say that Mrs. Maxwell called her into her office one morning in March or April around 8 o'clock, and took her over

to see a district judge whom Bonnie Gray had known and who supposedly knew the people who were interested in the adoption. The relator acknowledged to the judge at that time that she was going to give up the baby, and he inquired of her condition and the health of the father. She told the judge that she wanted to place the child with a good family, but didn't want to go through an agency.

Bonnie Gray also testified that Mrs. Maxwell and others, on many occasions prior to the birth of the child, suggested that she would be unable to care for the child; that by keeping the child she would destroy any hope of reconciliation with her husband; that she was no good for the baby; and that her ADC payments and food stamps would be discontinued. The relator also insisted that she was promised a payment of $1,500 for relinquishing the child and, on other occasions, claimed that she would be given a check for the amount of the hospital and physician's bills in the approximate sum of $1,400, and that the welfare agency would pay all the bills.

On Saturday, July 1, 1978, Mrs. Gray checked out of the hospital with the baby, went immediately to an attorney's office, and according to her, handed the baby over to Mrs. Maxwell, signed the relinquishment, and left. She was not given any money. Later that afternoon, or the next day, she said she realized what a foolish thing she had done, and thereafter called the attorney to ask for the return of the baby. He was not home, but did call her back on Sunday, at which time she told him "that I wanted my baby back and I told him of the deal that Mrs. Maxwell had said to me and the way she had talked to me and made offers and things like that."

Finally, Mrs. Gray identified a tape recording which she had made of two telephone conversations between herself and Mrs. Maxwell which, it was claimed, would corroborate the relator's allegations. There never was any real question that the voices on

the tape were those of Mrs. Gray and Mrs. Maxwell, but there was a real dispute as to which one of the parties had placed the calls. The respondents, Does, objected on the grounds that, although the conversations may have been admissions of Mrs. Maxwell, they were not binding on the Does because of lack of evidence of an agency relationship and, therefore, as to them, the conversations were hearsay. The receipt into evidence of this tape and a finding by the trial court of an agency relationship were assigned as errors.

Although we were unable to detect any evidence of wrongdoing on the part of Mrs. Maxwell from the contents of the recorded telephone conversations, and, as a matter of fact they consisted mostly of self-serving statements on the part of Mrs. Gray, the legitimate purpose in offering the tape in evidence was not to prove the truth of any assertion made, i.e., that the Does were offering a consideration for the relinquishment of the baby or that Mrs. Maxwell was acting as their agent. To the contrary, the evidence of such conversations was offered to corroborate the allegations made by the relator that such statements were made to her, and, ultimately to establish whether or not they had an effect upon the voluntariness of her acknowledgment of the relinquishment. An extra-judicial statement not offered to prove the truth of the matter asserted is not hearsay. Neb. Rev. Stat. § 27-801(3) (Reissue 1975). Important to our final decision is a determination of whether or not the relator was influenced by coercion, harassment, and promises of compensation to the point where the voluntary nature of the relinquishment was destroyed. In our consideration, it is immaterial whether any statements made by Mrs. Maxwell were as an agent of the Does or on her own behalf. The determination of the existence of any such agency not being relevant to a final determination in this case, it could in no way constitute preju-

dicial error. The tape recordings were not hearsay, and were properly received in evidence.

The testimony of Mrs. Maxwell was very brief. She denied ever threatening Bonnie Gray with the loss of ADC or food stamp benefits, denied any coercion or harassment of any nature, and denied any discussion of a payment of a consideration for the adoption of relator's child. She said she did not locate the prospective adoptive parents, but that it was either the district judge to whom Mrs. Gray had talked, or the lawyer who supervised the execution of the relinquishment, who was in touch with the Does. Apparently, although not completely clear from the record, the first contact Mrs. Maxwell had with Bonnie Gray directly relating to the mechanical aspects of this particular adoption was when the relator called her from the hospital on Friday following the birth of her child. She did concede that she had told Mrs. Gray that the adoptive parents should pay the medical costs and that the lawyer through whose offices the relinquishment was signed would be responsible for paying the bills, and that if she had paid them, he would be responsible for reimbursing her in whatever amount she had paid. Mrs. Maxwell had no quarrel with the identity of the voices in the recorded phone calls, but did deny that she had placed the calls and insisted that they were initiated by Mrs. Gray.

The lawyer who handled the execution of the relinquishment denied that he used any pressure or influence to obtain the relinquishment and denied that he in any way was representing the prospective adoptive parents. He insisted that he was representing the interests of Bonnie Gray, although his representation in that regard was not as a result of a specific retainer, but a carryover from his acting in her behalf on a prior matter.

John and Jane Doe both testified in their own behalf and recited that they had talked to the particu-

lar district judge previously mentioned some 3 years earlier about their desire to adopt a baby and that they received a call from him about the middle of May to the effect that a girl had been in his office who was pregnant and was interested in giving up the child. The judge inquired if they were still interested in an adoption and, when told that they were, he said he would send Mrs. Maxwell out to make an investigation of their home. She did make that investigation. The next thing that happened, according to their testimony, is that Mrs. Maxwell called them and told them that the girl had had the baby and they would be bringing it out on Saturday.

The judge testified by deposition that he remembers Mrs. Maxwell bringing Bonnie Gray to his office because the latter wanted to ask his advice about giving the baby for adoption. He said that he advised her not to give up the child if it was being done to win back her husband and that, if things didn't work out and she wanted the child back, that would be the worst thing she could do, i.e., to allow someone to become attached to the child and then demand it back. He said that he never talked to her again.

In reviewing a decision in a habeas corpus case involving the custody of a child, it is necessary that we try the case de novo on the record, giving great weight, however, to the findings of the trial court where the evidence is in irreconcilable conflict. *Raymond v. Cotner,* 175 Neb. 158, 120 N.W.2d 892 (1963).

The respondents, Does, claim that the trial judge erred in deciding issues not presented in the pleading. This is amplified by statements in their brief that

> Ms. Gray alleged that the coercion and undue influence were "manifested" in the form of promises of the payment of a sum of money which sum was never paid. . . . Nor

> does the pleading or the issues presented in the Petition include any issues as to the payment of money in consideration for the relinquishment and surrender of a child so as to constitute the sale of a child.

Whatever conclusion is reached, whether it be that the promises of payment amounted to coercion and undue influence as alleged by the relator, or constituted a prohibited sale as found by the trial court, there is no question but that the critical facts were contained within the petition. We have repeatedly said that proceedings in habeas corpus to obtain custody of a child are governed by considerations of expediency and equity, and should not be bound by technical rules. *Green v. Green,* 178 Neb. 207, 132 N.W.2d 380 (1965).

We do agree with the contention advanced by the Does and adopt the reasoning of *Barwin v. Reidy,* 62 N.M. 183, 307 P.2d 175 (1957), cited by them, that it is not contrary to public policy for persons wishing to adopt a child to make provisions with its mother before birth to pay hospital and medical expenses in connection with the care of the mother and the child. However, the findings by the trial court were that Mrs. Gray was to receive funds for payment of various expenses which had been paid in full or in part by the Department of Public Welfare and such amounts would therefore constitute the payment of a consideration for the relinquishment.

We have no hesitancy in agreeing with the trial judge that an agreement to pay a mother, in return for the relinquishment of her child, a sum equal to the amount of the hospital and medical expenses which have already been paid by another, constitutes an unwarranted payment of consideration which vitiates the relinquishment. *Barwin v. Reidy, supra.* However, the trial court also found that Mrs. Gray had been promised a separate payment of $1,500 for the same purpose. The testimony of the

witnesses both as to the payment of a consideration and as to evidence of coercion and harassment was in hopeless conflict and the trial judge, having observed the witnesses, chose to believe Mrs. Gray to the exclusion of the others. We cannot say that he was arbitrary, unreasonable, or even wrong in so doing. We conclude that the record supports his finding that the relinquishment of the child in this instance was done in consideration of a promise to pay a sum of money in excess of the legitimate expenses of confinement and birth, which is against public policy and vitiates the relinquishment previously given.

Finally, the respondents, Does, complain that the trial judge erred in finding that the relinquishment was not valid and was revocable, and cite in support of that proposition the cases of *Batt v. Nebraska Children's Home Society,* 185 Neb. 124, 174 N.W.2d 88 (1970), and *Kane v. United Catholic Social Services,* 187 Neb. 467, 191 N.W.2d 824 (1971). However, in the former case, there was a 5-month interval between the relinquishment and the attempt to revoke. In both cases, the mother was faced with Neb. Rev. Stat. § 43-106.01 (Reissue 1978), which provides that once a child has been relinquished in writing to the Department of Public Welfare or to a licensed child placement agency, and the latter has, in writing, accepted full responsibility for such child, the parent shall be relieved of all responsibilities for and rights over such child. The second case, *Kane v. United Catholic Social Services, supra,* emphasized that portion of the statute which states "and have no rights over such child" and interpreted that to mean "[t]he relinquishment *if voluntary,* as it is here, is not revocable." *Id.* at 470, 191 N.W.2d at 825 (emphasis supplied). The distinction is that, in this case, we find the evidence established that the relinquishment was not voluntary and revocation was attempted in a matter of hours. Additionally, the stat-

ute governing a private placement, as in this case, was Neb. Rev. Stat. § 43-111 (Reissue 1978): "Except as provided in section 43-106.01, after a decree of adoption has been entered, the natural parents of the adopted child shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such adopted child . . . ." This would suggest a vastly different expressed legislative intent as to the finality of a child relinquishment to a private person as opposed to one made to the Department of Public Welfare or a licensed adoption agency.

Since we have determined that the relinquishment was invalid, the Does no longer have any standing to contest the custody of this child. However, there remains the question that is present in every habeas corpus case involving child custody: the best interests of the child. We said in *Eravi v. Bohnert,* 201 Neb. 99, 106, 266 N.W.2d 228, 231 (1978): "Generally speaking, it is in the best interests of the child that he should be in the care of his natural parent." That assumes, of course, that it is not shown that such parent is unfit to perform parental duties, or that such parent has not forfeited such right by abandonment or otherwise. *State ex rel. Cochrane v. Blanco,* 177 Neb. 149, 128 N.W.2d 615 (1964). As suggested in *Barwin v. Reidy, supra,* we can think of few more drastic ways in which children can be abandoned than by selling them. We recognize that relator may have reconsidered her relinquishment because of more honorable reasons than failure of consideration. However, we do not believe that her continuing fitness can be determined simply because of a lack of evidence to show the otherwise unfitness of the relator. We, therefore, believe that a hearing should be held to affirmatively determine the question of relator's fitness as a parent, in light of all of these circumstances and the best interests of the child, and that at such hearing an attorney be ap-

pointed to represent the interests of the child.   We, therefore, modify the trial court's decree to that extent and remand the cause for such hearing.   Otherwise, the judgment is affirmed.

AFFIRMED AS MODIFIED.