HEATHER C. YOPP, APPELLANT, v. LAWRENCE I. BATT, ATTORNEY
AT LAW, JOHN DOE AND MARY DOE, REAL NAMES UNKNOWN,
PERSONS IN POSSESSION OF BABY GIRL YOPP, APPELLEES.

467 N.W.2d 868

Filed April 5, 1991.   No. 90-593.

John H. Kellogg, Jr., for appellant.

Thomas F. Hoarty, Jr., of McGowan & Hoarty, for appellees Doe.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

Heather C. Yopp appeals the order of the Douglas County District Court denying her application for a writ of habeas corpus filed February 6, 1990. By the writ, Yopp attempted to recover possession of a baby girl born to her on January 3, 1990, in Omaha, Nebraska. At the time of the birth, Yopp was 15 years old and unmarried. On January 5, she relinquished by written instrument all rights to the child, and the baby was turned over to John and Mary Doe, real names unknown, a married couple referred to Yopp's attorney, Lawrence I. Batt, by Yopp's physician. The child has not yet been formally adopted by the Does pending this action. At no time during this action have the paternal rights of the natural father been at issue.

Yopp, a resident of Council Bluffs, Iowa, discovered she was pregnant in July 1989. At the time, Yopp was residing with her mother, Connie Howat. Yopp did not tell her mother or father she was pregnant at that time, but disclosed her pregnancy to the natural father and to several girl friends. One of her friends informed Yopp's mother of the pregnancy. Yopp and her mother discussed Yopp's pregnancy, and Yopp expressed her intent to have an abortion. Howat did not discuss with Yopp any alternatives to abortion because Yopp said she wished to terminate the pregnancy. Howat made an appointment for Yopp at Womens Services, P.C., in Omaha on October 14, 1989,

where Yopp was examined by Dr. C.J. LaBenz. LaBenz informed Yopp that she was $6^1/_2$ months pregnant and that her pregnancy was too advanced for abortion. LaBenz discussed payment for his services at this meeting. He said that a welfare program for obstetrical services was available at the University of Nebraska Medical Center. Yopp declined to use those services. LaBenz also said that in the case of adoption, the adoptive family usually paid the medical bills of the relinquishing mother. LaBenz also stated that Yopp would be responsible for the medical expenses as they were incurred and that reimbursement from insurance or from the adoptive family would occur only after the birth. Yopp continued seeing LaBenz for prenatal care and returned for another appointment approximately 1 week later.

During this appointment, LaBenz questioned Yopp about what she intended to do with the baby. Yopp told LaBenz that she intended to give up the baby for adoption. Howat was present with Yopp during this discussion. LaBenz then briefly explained the difference between closed and open adoptions. Yopp testified that LaBenz also expressed his dissatisfaction with certain adoption agencies in the area, but he did not name these agencies.

LaBenz also questioned Yopp about her arrangements for putting the baby up for adoption. Yopp said that she had made no arrangements and that she did not have an attorney. LaBenz then gave Yopp Batt's name and told her he was an attorney that could help her with the adoption. LaBenz did not give Yopp the names of any other attorneys. LaBenz contacted Batt and informed him he had referred Yopp to Batt for a private adoption.

During another appointment in early December, LaBenz again questioned Yopp about her adoption plans, and she said she still intended to put the baby up for adoption, but had not contacted Batt or any other attorney. LaBenz encouraged her to make some arrangements quickly because the baby was due in less than a month.

Howat and Yopp finally met with Batt on December 13, 1989. Batt testified he understood that his meeting with Yopp was for the purpose of legal representation with regard to the

relinquishment of a child to be born to Yopp in the beginning of January. Yopp testified at trial that she was never absolutely sure she wanted to give up the baby for adoption, but she went to Batt to learn "how adoption worked." Batt had previously represented LaBenz; Dr. George William Orr, another physician at Womens Services; and Womens Services itself in various other legal matters. Yopp was unaware of this prior representation.

Upon arriving in Batt's office, Yopp was asked to fill out a lengthy questionnaire concerning her medical history and her intentions with regard to the baby. In response to a question on the form, Yopp wrote that she intended to give up the baby for adoption because she was too young to raise it. During the meeting with Yopp and her mother, Batt talked to Yopp about her options, those being whether to keep the baby or give up the baby for adoption. Yopp informed him that previously she had intended to have an abortion, but she now wanted to put the baby up for adoption. Batt questioned her about her future and stated that Yopp indicated that having a baby would not fit into her plans for completing school. Batt testified that during this portion of the meeting, Yopp's mother seemed very supportive and nothing led him to believe that Yopp did not want to relinquish the baby.

Batt then outlined the procedures involved in relinquishing a child. He told her that after she gave birth, he would come to the hospital and have her sign the relinquishment papers. He then discussed each document that he would be bringing to the hospital. Batt also discussed the prospective adoptive family with Yopp and her mother. Yopp indicated that she wanted "a good family for it." He then explained the difference between open and closed adoptions, and Yopp indicated that she wanted a totally closed adoption. Finally, Batt discussed payment of his fees. He stated that generally the adoptive parents paid the pregnancy-related medical expenses and the attorney fees. At the conclusion of the meeting, Batt requested that he speak to Yopp privately. During the private meeting, Batt inquired about the natural father of the child, Yopp's drug and alcohol history, and whether or not anyone was influencing Yopp to make the decision to relinquish. Batt testified that he was confident that

Yopp had arrived at her decision to relinquish independently and without influence from anyone else. This was Yopp's only meeting with Batt prior to the signing of the relinquishment papers.

On January 3, 1990, Yopp gave birth to a baby girl. Following the delivery, Yopp did not touch or hold the baby and stated that she did not want to take any pictures of the baby. Later that evening a nurse asked Yopp if she wanted to see the baby, and she declined. The following day, Yopp visited the baby in the nursery. On the morning of January 5, Yopp telephoned her mother at work and told her she wanted more information about the adoptive parents. Shortly after she finished speaking with her mother, Batt called Yopp at the hospital to set up a time for her to sign the relinquishment papers. Yopp told him she wanted to know more about the adoptive family. Batt asked her what she wanted to know, and she said she wanted to know what state they lived in and if she could have yearly pictures of the child. Yopp testified that she told Batt during the call that she had changed her mind and now wanted an open adoption, but Batt told her it was too late for that. Yopp did not ask for any other information besides the state of residence of the adoptive parents and the yearly pictures of the child.

Prior to Batt's arrival at the hospital, a social worker stopped by Yopp's hospital room and asked her if she wanted to discuss the relinquishment of her child. Yopp told the social worker that her family was supportive of her and that she did not want counseling. The social worker gave Yopp her business card and told Yopp to call anytime if she needed anyone to talk to.

That afternoon Batt and another attorney from his firm, Thomas Kenny, arrived at the hospital with the relinquishment papers. Kenny was to act as a witness at the signing. When they arrived, the baby was in the room with Yopp and her mother. After a nurse took the baby back to the nursery, Batt told Yopp that the adoptive parents lived in Nebraska and that they had agreed to send yearly pictures of the child to Yopp through Batt. Batt then asked Yopp if she was ready to sign the relinquishment papers, and she said yes. Batt had with him two copies and the original of several documents. He presented Yopp with a copy

of each of the documents, which he instructed her to read. Batt testified that Yopp appeared to be calm and in control of herself. Yopp finished reading the documents, and Batt asked her if she had any questions. She said no. Batt then proceeded to explain each document to her. Batt testified that he explained the consent and relinquishment form to Yopp paragraph by paragraph, and indicated to her that she would be giving up all her rights to the child. Yopp testified that she knew she was relinquishing all rights to the child at that time. The consent and relinquishment form contained blanks where the names of the adoptive parents would later be inserted by Batt. Batt testified that Yopp understood that the relinquishment form would not contain the names of the adoptive parents. He said that Yopp never asked him for the names of the adoptive parents prior to the relinquishment.

Batt then concluded his explanation of all the forms and asked Yopp if she was ready to proceed. She indicated she was. Batt then presented the original of each of the documents to her, and she signed the documents, including the consent and relinquishment containing the blanks. As she signed, Batt identified each document, but did not offer any further explanation of the documents. Batt testified that Yopp did not hesitate in signing any of the documents.

After Yopp signed, Batt asked her if she wished Kenny to witness the documents, and she said yes. Kenny then questioned Yopp regarding her motivation for the relinquishment. He testified that Yopp said she understood each document, was signing them freely and voluntarily, and wished to proceed with the relinquishment. Kenny then signed the documents. Batt then took the documents and asked Yopp again if she still wished to proceed. She again replied yes, and then Batt affixed his notary seal to each of the documents. In addition to the documents signed by Yopp, Batt also requested that Howat read and sign a document affirming the facts that Yopp was a minor and that Yopp was making the decision to relinquish of her own free will. Howat signed the document, and Batt and Kenny left the hospital. Yopp was not given copies of the documents at that time.

On the morning of January 6, Batt turned the baby over to

the Does. The Does were referred to Batt by LaBenz. The Does had previously been seen by Dr. Orr at Womens Services and had expressed their desire to adopt a baby. At the time of their meeting with Orr, the Does filled out a form containing information about their employment and medical history. This form was kept on file at Womens Services. After Yopp had her baby, LaBenz asked Dr. Orr if he knew of a prospective adoptive couple, and Orr mentioned the Does. LaBenz contacted the Does and told them there might be an available baby and told them to contact Batt. The Does then contacted Batt, and he informed them of the birth of Yopp's baby and that the baby was in good health. Batt also testified that he questioned Mary Doe about the Does' reasons for adopting, employment, income, religion, other children, and demographic background, and determined that they were a suitable couple for Yopp's child. Following the relinquishment, he delivered the baby to the Does and has not had possession of the child since that time. Batt testified that he never acted as the Does' attorney at any time during the relinquishment.

Yopp left the hospital on the evening of January 5. Yopp testified that on the morning of January 6, she told her mother that she felt she did the wrong thing and that her mother told her to think about it for awhile. The following Tuesday, Yopp indicated to her mother that she wanted the baby back. Yopp then decided to contact her father, who until this time had not been told of her pregnancy. On January 17, Yopp, Howat, and Yopp's father and stepmother met with Batt at his office and told him Yopp wanted the baby back. Batt told Yopp that he could not represent her in her action to have the baby returned because he would be called as a witness during the proceedings and it would be a conflict of interest. Yopp asked Batt for the names of the Does, and Batt refused to give her that information. Yopp also asked for copies of all the documents she signed, and Batt told her that he needed to delete the names of the Does from the documents and that he would have the papers ready for her in about a week. Following the meeting with Batt, Yopp hired another attorney, who also demanded information about the Does from Batt. When Batt refused again, Yopp initiated this action.

In her action for writ of habeas corpus, Yopp named Batt, as well as the Does, as a party because Batt was the only person known to her to have information regarding the identity and whereabouts of the Does. The district court issued a protective order prohibiting disclosure of the Does' identity during discovery. The Does were also permitted, under the protective order, to testify at the proceedings without revealing their identity or location. The trial court bifurcated the proceedings, trying the issue of the validity of the relinquishment first. The court determined that a "best interests of the child" hearing was only necessary if the relinquishment was found invalid. The court found that the relinquishment was a valid instrument entered into voluntarily, knowingly, and intelligently by Yopp. The court also found that the Interstate Compact on the Placement of Children was inapplicable to this case and denied the writ of habeas corpus. Yopp's motion for new trial was overruled. The court granted Yopp 15 days to ask for a hearing on the best interests issue, but Yopp failed to ask for the hearing within the time period. Yopp filed this appeal, and the district court denied her motion for a stay of adoption pending the decision of this court.

Yopp assigns as error the following: the district court's finding that the Interstate Compact on the Placement of Children, Neb. Rev. Stat. § 43-1101 (Reissue 1988), did not apply to this case; the court's disregard of Yopp's claim that Batt, Womens Services, and Dr. LaBenz violated Neb. Rev. Stat. § 43-701 (Reissue 1988) by assisting in the placement of a child in Nebraska without first obtaining a license; the court's finding that Yopp's relinquishment of her baby was knowing, intelligent, and voluntary; the court's disregard of evidence showing that Yopp was not presented with a copy of the nonconsent form for the biological parent as required by Neb. Rev. Stat. § 43-146.06 (Reissue 1988); the court's refusal to permit evidence of Batt's invocation of the fifth amendment during a deposition; and finally, the court's decision to bifurcate the proceedings and prevent evidence on the best interests issue during the hearing.

In this case, we are concerned with a relinquishment for the purposes of a private, closed adoption. The Legislature, as well

as this court, has long recognized a distinction between agency adoptions and private adoptions. In the agency adoption situation, the relinquishing parent surrenders all rights to the child in favor of the state or a licensed child placement agency. Neb. Rev. Stat. § 43-106.01 (Reissue 1988) mandates that when a child is relinquished by written instrument to the Department of Social Services or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the relinquishing parent is relieved of all parental duty and all responsibility for the child and shall have no rights over the child. Under § 43-106.01, the rights of the relinquishing parent are terminated when the agency accepts responsibility for the child in writing. It is the agency that finds and investigates the prospective adoptive parents. If the adoptive parents are unsuitable or decline to go through with the adoption, the agency retains custody over the child until such time as the child is adopted by another family.

In contrast, in the private adoption situation the child is relinquished directly into the hands of the prospective adoptive parents without interference by the state or a private agency. In the case of a closed adoption, the relinquishing parent surrenders his or her rights to unknown parties. Neb. Rev. Stat. § 43-111 (Reissue 1988) provides that, except in the agency adoption situation, after an adoption decree has been entered, the natural parents of the adopted child shall be relieved of all parental duties and responsibilities for the child and shall have no rights over the child. Under § 43-111, the relinquishing parent's rights are not totally extinguished until the child has been formally adopted by the prospective parents. Neb. Rev. Stat. § 43-109 (Cum. Supp. 1990) requires that in order for the adoption of a child to take place, a hearing on the best interests of the child must be held, the child must have lived with the prospective adoptive family for the previous 6 months, the medical history of the biological parent or parents must be made a part of the court record, and there must be in the court record an affidavit from the relinquishing parent swearing that prior to the relinquishment a nonconsent form was presented and explained to the biological parent or parents. Since under Nebraska law an adoption cannot take place until at least 6

months after the relinquishment of the child, in the case of a private adoption the question of who retains the legal right to the child during this time is unclear.

This issue becomes particularly troublesome in the case where the relinquishing parent decides he or she wants the child returned. This court has dealt with the rights of the respective parties in both private adoption cases and agency adoption cases on numerous occasions.

In *Batt v. Nebraska Children's Home Society*, 185 Neb. 124, 174 N.W.2d 88 (1970), and in *Kane v. United Catholic Social Services*, 187 Neb. 467, 191 N.W.2d 824 (1971), the appellants sought to have the relinquishments of their children to the child placement agencies invalidated on the grounds that the relinquishments were obtained through fraud, duress, and coercion. This court applied the strict language of § 43-106.01 in holding that a relinquishment, if voluntary, is not revocable. The court then went on to find that both relinquishments were entered into freely and voluntarily and therefore were valid.

In 1980, we decided *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980), a private adoption case. The appellant sought to regain custody of a child she relinquished to the prospective adoptive parents. The trial court held in favor of Gray, and the Does, the adoptive parents, assigned as error the trial court's finding that Gray's relinquishment was not valid and therefore revocable. The Does cited in support of this proposition *Batt v. Nebraska Children's Home Society, supra*, and *Kane v. United Catholic Social Services, supra*. This court found that the relinquishment was involuntary and that revocation of the relinquishment was effected within a matter of hours. We concluded that because the relinquishment was involuntary, *Kane* and *Batt* were not applicable. We also determined that the Legislature had expressed a different intent in § 43-111, the statute governing private adoptions. Under § 43-111, we interpreted a relinquishment in a private adoption to be "less final" than one made to a licensed child placement agency under § 43-106.01, but did not make any findings of law on this issue. We then determined that since the relinquishment was invalid, the adoptive parents had no standing to contest the custody of the child, but ordered the district court to hold a best

interests hearing to determine the fitness of the natural parent before returning the child to her.

In 1981, we decided two cases on the same day, dealing with both a private adoption and an agency adoption. In *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981), we considered the validity of a relinquishment in an agency adoption case. The natural parents sought the return of their daughter from the adoption agency by writ of habeas corpus. The agency took custody of the child after the natural mother relinquished her rights, but did not sign a written acceptance of the relinquishment until after the mother revoked, in writing, her consent to relinquish. The district court found that the relinquishment was valid, but also that the mother had validly revoked the instrument prior to acceptance by Lutheran Family and Social Service. The district court then held a best interests hearing and determined that it was in the best interests of the child to remain with the adoptive family. This court reversed the district court and held that an executed revocation to a consent and relinquishment delivered to a child placement agency within a reasonable period of time after execution of the relinquishment, and before acceptance in writing by the agency of the responsibility for the child, is effective to invalidate the original relinquishment and consent. This court stated that basic principles of offer and acceptance require that result. The court held that since the relinquishment was no longer valid, the fitness of the natural or adoptive parents was no longer an issue. We then remanded the cause with instructions to the district court to return the child to the natural mother.

In *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981), we considered the validity of a relinquishment in a private adoption case. The appellant also sought the return of her child through writ of habeas corpus. The trial court found for the Mattleys. This court affirmed the trial court and determined that the relinquishment was valid. This court then shifted its attention to the best interests of the child issue. The court held that following a valid relinquishment of rights to a child, the petitioner must show that the best interests of the child require that the child be returned to her. The court stated that the

natural mother's parental rights were no longer an issue, and the natural mother and the adoptive family stood on equal ground with respect to determining custody. The petitioner must make an affirmative showing that the child's best interests require that custody be returned to the natural parent. This court then affirmed the decision of the trial court in determining that no such showing had been made.

This court again dealt with the private adoption issue, in *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985), and *Gaughan v. Gilliam*, 224 Neb. 836, 401 N.W.2d 687 (1987). In both cases we followed our reasoning in *Lum v. Mattley, supra*, in finding the appellant's relinquishment of her child valid. We determined that the appellants in both cases failed to sustain their burden of proving that the best interests of the children required that they be returned to the natural parents.

Our earlier cases, *Batt v. Nebraska Children's Home Society*, 185 Neb. 124, 174 N.W.2d 88 (1970), and *Kane v. United Catholic Social Services*, 187 Neb. 467, 191 N.W.2d 824 (1971), held that a valid relinquishment is irrevocable by the relinquishing parent, at least in the case of an agency adoption. In *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980), a private adoption case, we held that the relinquishment was invalid, thereby eliminating the need to determine if it was or was not revocable by the relinquishing parent. In that case, we stated in dicta that the Legislature did not intend for a relinquishment in a private adoption case to be final until the adoption decree was entered. However, in *Gray*, we did not simply return the child to the relinquishing parent, but ordered the district court to hold a best interests hearing for the benefit of the child.

In *Kellie*, we allowed the relinquishing parent, in an agency adoption, to revoke the relinquishment within a reasonable period of time before the agency had, in writing, taken responsibility for the child. We determined that a best interests hearing was not necessary because, under contract law, the relinquishing parent had revoked prior to acceptance by the agency and thus retained all legal rights to the child. We did not, however, apply these same contract principles in the private adoption case. In *Lum*, *Auman*, and *Gaughan*, we determined

that the relinquishments were valid, and the only way the relinquishing parent could achieve the return of her child was to prove, in a best interests hearing, that the best interests of the child required that the child be returned to her.

The Legislature has seen fit to distinguish between agency and private adoption, but has not made explicit the rights of the parties in the private adoption case. In the case of private adoptions, we hold that a natural parent who relinquishes his or her rights to a child by a valid written instrument gives up all rights to the child at the time of the relinquishment. A valid relinquishment is irrevocable. The natural parent retains only the right to commence an action seeking the return of the child and the right to be considered as a prospective parent if the best interests of the child so dictate. The natural parent's rights are no longer superior to those of the prospective adoptive family. See *Lum v. Mattley, supra.*

The prospective adoptive family is obligated to take custody of the child, to care for the child, to keep the child in good physical and mental health, and to pursue adoption of the child. The prospective adoptive parents have standing to contest custody of the child if they so desire. The relinquishing parent and the prospective adoptive parents stand on equal ground with respect to determining custody. In the event the prospective adoptive family chooses not to adopt the child, or the state or agency determines the prospective adoptive parents unsuitable, the natural parent shall have the right to seek the return of the child and be considered as a prospective parent. When a conflict over custody of the child arises, the court shall take custody of the child and conduct a hearing to determine whether the best interests of the child require the child to remain with the prospective adoptive family or be returned to the natural parent. The court shall appoint an attorney to represent the child in the proceeding. Physical custody of the child may remain with the prospective adoptive family during the pendency of the proceedings if the court finds the child's situation suitable. Additionally, if the relinquishment of rights by the natural parent is found to be invalid for any reason, a best interests hearing shall also be held to determine custody of the child. The court shall not simply return the child to the

natural parent upon a finding that the relinquishment was not a valid instrument. By these rules, we have sought to keep the best interests of the child at the forefront of the inquiry. We now turn to the merits of Yopp's case.

Yopp first assigns as error the district court's finding that § 43-1101, the Interstate Compact on the Placement of Children, did not apply to this case. We agree with the district court. Yopp's child was born in Omaha, Nebraska. The adoptive parents, John and Mary Doe, reside in Nebraska. The child was never taken from Omaha to Council Bluffs, Iowa, the residence of Yopp. The fact that Yopp is a resident of Iowa is not determinative in this case. The statute does not mandate that the residence of the mother is considered the residence of the child. The child was never a resident of Iowa and was not placed across state lines. Section 43-1101 is not applicable.

Yopp next claims the district court erred in disregarding her claim that Batt, LaBenz, and Womens Services violated § 43-701 by assisting in the placement of a child for adoption without obtaining a license. We assume that Yopp wishes to vitiate the relinquishment of her rights to the child through use of § 43-701. Neb. Rev. Stat. § 43-709 (Reissue 1988) provides that violation of § 43-701 is a Class III misdemeanor. Nowhere in § 43-709 does it state that any relinquishment or subsequent adoption of a child will be invalid if the party placing the child for adoption is in violation of § 43-701. Yopp may not make use of § 43-701 to invalidate her relinquishment. Yopp's second assignment of error is without merit.

We now turn to Yopp's fourth, fifth, and sixth assignments of error, leaving the issue of whether her relinquishment was valid until last. Yopp claims, in her fourth assigned error, that the district court disregarded evidence that she was not presented with a copy of the nonconsent form as required by § 43-146.06.

By definition, a nonconsent form is a notice filed by the biological parent stating that at no time prior to his or her death may any information on the adopted person's original birth certificate or any other identifying information except medical history be released to the adopted person. See § 43-146.06. Section 43-146.06 permits the biological parent to file a

nonconsent form at any time prior to his or her death. Failure of the biological parent to sign the form operates as a notice of consent by the parent to release the adopted person's original birth certificate and identifying information.

Neb. Rev. Stat. § 43-106.02 (Reissue 1988) mandates that the relinquishing parent be given the option of signing the nonconsent prior to the final relinquishment. Section 43-109(1)(c) specifies that an adoption decree will not be entered unless the court record includes an affidavit signed by the biological parent stating that he or she was presented with and given an explanation of the nonconsent form. Section 43-109(1)(c) does not state that the relinquishment itself will be invalid.

The purpose of the nonconsent form is to conceal the identity of the biological parent if that parent wishes to remain anonymous. The intent behind the legislation enacting these statutes was to prevent adoptive children from locating their biological parents if those parents did not wish to be contacted, while still allowing the adopted child access to medical history information. See Health and Human Services Committee Hearing, L.B. 372, 90th Leg., 1st Sess. (Feb. 12, 1987).

Yopp attempts to use what she alleges as technical noncompliance with the adoption statutes to vitiate the relinquishment of her child and to have the baby returned to her. This is not the purpose of the statutes. The goal of the nonconsent form laws was to safeguard the identity of the biological parent while giving the adoptive child access to needed medical history. The Legislature intended that relinquishing parents be informed of their right to safeguard this information prior to the actual relinquishment. It also intended that the fact that the biological parent was so informed was to be made a part of the court record. However, it is doubtful that the Legislature intended to invalidate all parental relinquishments simply because the biological parent was not presented with the form at the time of the actual relinquishment, or did not physically retain a copy of the form after signing the relinquishment papers. Section 43-109(1)(c) declares that an *adoption* decree will not be entered unless the relinquishing parent has viewed the nonconsent form and

attests to that fact. In this case, Yopp *was* presented with a nonconsent form before she signed the consent and relinquishment. She now claims that because she was not given a copy of the form to take with her when she left the hospital, somehow her relinquishment is defective. Sections 43-106.02 and 43-109(1)(c) require only that the biological parent be *presented* with the form prior to signing the relinquishment. Certainly the form was presented to Yopp. She read it and signed it before signing the relinquishment. The fact that she did not take a copy with her when she left the hospital is inconsequential. Her claim is meritless.

In her fifth assignment of error Yopp claims that the district court erred by refusing to allow testimony concerning Batt's invocation of the fifth amendment during a deposition scheduled in this case. Although Yopp assigns this as error in her brief, she has not felt it necessary to elaborate further on her claim other than to simply list it among the assigned errors. Consequently, she has also failed to enlighten us as to the relevance of this evidence to her case.

Only relevant evidence is admissible. Neb. Rev. Stat. § 27-402 (Reissue 1989). Neb. Rev. Stat. § 27-401 (Reissue 1989) defines relevant evidence as evidence tending to make the existence of any fact of consequence to the action more or less probable than it would be without the evidence. Batt, in his deposition, refused to answer questions put to him by Yopp's counsel on the grounds that it might incriminate him because during the deposition Yopp's counsel accused Batt of violations of the interstate compact on the Placement of Children, which carries with it a criminal penalty. This habeas corpus action is civil in nature. The fact that Batt may or may not have been in violation of the interstate compact has absolutely no bearing on whether Yopp's relinquishment of her child was valid. We agree with the district court's determination that this evidence was irrelevant. Yopp's fifth assignment of error is without merit.

Yopp next claims that the district court erred in bifurcating the trial into the relinquishment issue and the best interests issue. She also claims the district court prevented her from offering any evidence on the best interests issue. Again, she has neglected to expand her argument on this point beyond simply

listing it as an assigned error.

It is undisputed that the trial judge has broad discretion over the general conduct of a trial. *Misle Chevrolet Co. v. Kometscher*, 225 Neb. 804, 408 N.W.2d 713 (1987); *Kenyon & Larsen v. Deyle*, 205 Neb. 209, 286 N.W.2d 759 (1980). In this case, the district court determined that the validity of the relinquishment was first at issue and thus bifurcated the proceedings. If the relinquishment was found valid, then Yopp must go on to prove that despite her relinquishment of her child, it would be in the best interests of the child to be returned to her. Since no evidence concerning the best interests of the baby was heard at the proceeding on Yopp's writ, the district court gave Yopp an extra 15 days to gather such evidence and request a best interests hearing. Yopp declined to exercise this option. She can hardly claim at this late date that the district court failed to *allow* her to present her evidence. Furthermore, it was certainly reasonable, if not more efficient, for the court to split the proceedings in two. This assignment of error is totally meritless.

Finally, we reach the crux of this case—Yopp's claim that the relinquishment of her child was invalid.

A decision in a habeas corpus case involving the custody of a child is reviewed by this court de novo on the record. *Gaughan v. Gilliam*, 224 Neb. 836, 401 N.W.2d 687 (1987); *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985).

The burden is on the natural parent challenging the validity of the relinquishment to prove that it was not voluntarily given. *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981); *Auman v. Toomey, supra.*

In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid. *Lum v. Mattley, supra*; *Auman v. Toomey, supra.*

Yopp lists numerous allegations in support of her contention that her consent was involuntary. Among them are claims that she was under physical and mental distress at the time of the signing, that she did not receive any counseling or information concerning alternatives to adoption, that she suffered from

lack of independent counsel because Batt had earlier represented LaBenz and Womens Services and also had contact with the adoptive family, that she was told by Batt it was too late for an open adoption and was denied information about the adoptive family, that her mother was induced somehow by the information that the adoptive family would pay the attorney fees and medical bills for Yopp, that she received false information about agency versus private adoptions, that she signed documents falsely stating that she had selected the adoptive family, and that she was improperly induced to sign by the adoptive parents' promise to provide her with yearly pictures.

We find Yopp's allegations unpersuasive. At the outset, Yopp evidenced her desire not to keep the child. She initially intended to have an abortion. When that became impossible due to her advanced stage of pregnancy, she expressed her desire to give up the baby for adoption. She told her mother, her physician, and her lawyer that she did not wish to keep the child. She never, at any time, told anyone that she was in doubt over her decision or that she was considering keeping the child. It was only *after* she relinquished all rights to her baby that she changed her mind. A change of attitude subsequent to signing a relinquishment is insufficient to invalidate the relinquishment. *Auman v. Toomey, supra.* See *Batt v. Nebraska Children's Home Society*, 185 Neb. 124, 174 N.W.2d 88 (1970).

Yopp spoke to her mother about the pregnancy on numerous occasions prior to the birth of the child. Yopp testified that her mother was very supportive and told her if she decided to keep the baby, they would "make it work." Prior to the actual relinquishment, Yopp also had the opportunity to discuss her situation with a social worker. She refused counseling, stating that her family had been very supportive. The record is replete with evidence from Yopp's mother; the social worker; the nurse assigned to Yopp while she was in the hospital; Batt; Batt's associate, Kenny; and Yopp's physician, LaBenz, supporting our conclusion that Yopp knew what she was doing, made her decision independently and without influence from any other party, and had intended to give up the baby all along. There is no evidence in the record that Yopp was coerced or pressured to

give up her child. The fact that the adoptive parents agreed to pay Yopp's medical bills and attorney fees does not itself establish coercion.

Yopp's claim that somehow Batt's advice or service to her was defective because of his prior relationships with LaBenz and Womens Services is not supported by any evidence of wrongdoing on his part. The mere fact that he was in contact with the Does does not establish anything to support Yopp's claims. In the case of a private, closed adoption such as this, contact between the attorneys and the various parties is necessary to effectuate transfer of the child. We find Yopp's allegations as outlined above unsupported by the record. Her relinquishment and consent to adoption of the child are valid. She has waived her right to a best interests hearing by failing to request the hearing within the 15 days given her by the district court. The judgment of the district court is affirmed.

AFFIRMED.

HASTINGS, C.J., concurs.