RICHARD FREEMAN MCCORMICK AND JOAN MAXINE MCCORMICK, APPELLANTS, V. STATE OF NEBRASKA, DEPARTMENT OF PUBLIC WELFARE, ET AL., APPELLEES.

354 N.W.2d 160

Filed August 31, 1984.   No. 84-100.

James H. Monahan, for appellants.

Paul L. Douglas, Attorney General, and Royce N. Harper, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

Richard and Joan McCormick appeal from the order of the district court dismissing their petition for a writ of habeas corpus. The McCormicks brought the action to cancel their relinquishment and obtain custody of their son, Mark William McCormick. The McCormicks claim that the relinquishment of parental rights which they executed was not signed voluntarily and was therefore invalid.

The record shows that in 1981 the State commenced an action in the separate juvenile court to terminate the parental rights of Richard and Joan McCormick to their son Mark. A final hearing in that matter was set for March 23, 1982. Shortly before that hearing was to begin, there was a discussion in the courthouse hallway among the McCormicks; their pastor; their court-appointed counsel, James Pruss; the guardian ad litem, Kenneth Weiner; and Mary Lee Kenworthy, a caseworker from the Department of Welfare. During this discussion, it was explained to the McCormicks that if they signed a relinquishment of their parental rights, there was a possibility that an "open adoption" could be arranged, provided that cooperative adoptive parents could be found. An "open adoption" is described in the record as one where the natural parents continue to have contact with their child. The "open adoption" idea was first brought up in the discussion by the caseworker.

It appears that Mrs. McCormick understood "open adoption" meant that she and her husband would be able as a matter of right to see their son following an adoption. Mr. McCormick does not recall any of the events of March 23, 1982, apparently due to a combination of medication and the mental condition from which he suffers. Pruss told the McCormicks that it was likely that the juvenile judge would terminate their rights if the March 23, 1982, hearing was held, and he advised the McCormicks that the open adoption may be the "best route to go."

The McCormicks then signed a relinquishment. Immediately thereafter, the hearing commenced and the court was informed

that a relinquishment had been signed. The court granted the guardian ad litem's motion for a continuance until such time as an adoption was arranged or for 9 months.

Pruss testified that the attitude of those representing the State changed as soon as the relinquishment was signed, in that they moved quickly to obtain the child's possessions from the McCormicks. The McCormicks have not been permitted visitation with their son since the relinquishment was signed.

The McCormicks brought this action in August 1982 for a writ of habeas corpus. The district court dismissed the petition for a writ of habeas corpus but continued a restraining order preventing the arrangement of an adoption of Mark McCormick pending this appeal.

A decision in a habeas corpus case involving the custody of a child is reviewed by this court de novo on the record. Where the evidence is in irreconcilable conflict, we consider the findings of the trial court. *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980); *Raymond v. Cotner*, 175 Neb. 158, 120 N.W.2d 892 (1963). Proceedings in habeas corpus to obtain custody of a child are governed by considerations of expediency and equity, and should not be bound by technical rules. *Gray v. Maxwell, supra.*

"In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption form signed by a natural parent knowingly, intelligently, and voluntarily is valid." (Syllabus of the court.) *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981). The question before us on this appeal is whether the relinquishment was voluntarily executed.

The McCormicks contend that they were coerced into signing the relinquishment, as they were led to believe that they could continue to see their son following an adoption if they signed the relinquishment but would not be provided that opportunity if their rights were terminated as a result of the impending judicial proceeding. The State argues that the McCormicks were informed at the time the relinquishment was signed that an "open adoption" was not guaranteed, but was at the option of the adoptive parents.

Upon de novo review of the record we conclude that the

relinquishment was signed by the McCormicks as the result of coercion.

In *Duncan v. Harden*, 234 Ga. 204, 214 S.E.2d 890 (1975), the parents filed an action for a writ of habeas corpus in September 1974, claiming that they did not voluntarily sign relinquishments shortly following their child's birth in May 1974. The court held that family pressures on the mother and the fact that the mother was taking "mind-dulling" medication at the time the relinquishment was signed rendered her consent to adoption involuntary. The father's consent was also deemed involuntary, as it was given only after he received a "threatening" letter from the caseworker, stating:

> "I am requesting that you send these releases as soon as possible. If I do not receive them shortly, it will be necessary to approach the Juvenile Court regarding severing your parental rights. This is a complicated, drawn-out process which would require your and Dale's appearance in the Juvenile Court. . ."

*Id.* at 207, 214 S.E.2d at 892.

In *Matter of Danielson*, 104 Misc. 2d 33, 427 N.Y.S.2d 572, 574 (1980), the court stated:

> Mrs. Lewis did not sign the surrender freely and voluntarily and without outside influence. The record clearly indicates that Donald Lewis, Mrs. Lewis' husband at the time of the execution of the surrender, was instrumental in persuading Mrs. Lewis to sign the surrender. The court is satisfied that Mr. Lewis made it clear to his wife that he would leave her unless she permanently surrendered this child for adoption. In effect, Mrs. Lewis was forced to choose between her husband and her child. Under such circumstances the surrender can hardly be said to have been obtained without duress or coercion. Additionally, there may even be an element of fraud involved herein as the record indicates that Donald Lewis left his wife, despite his promise to remain, shortly after she had signed the surrender. There is nothing in Section 384 of the Social Services Law which indicates that the fraud, duress or coercion must be on the part of the Department of Social

Services.

In *Matter of Male M.*, 76 A.D.2d 839, 428 N.Y.S.2d 489 (1980), the court permitted a mother to revoke her consent to an adoption. The revocation was filed 4 months after the consent was signed. The court said at 839, 428 N.Y.S.2d at 490:

Although the adoptive parents did not participate in any deception to induce the consent, the record establishes that the natural mother believed, at the time she executed the consent, and when her signature was later acknowledged, that a nun in whom she had trust and confidence had recommended the prospective adoptive parents and that the prospective parents resided in Westchester County. (The natural mother did not want the adoptive parents to live nearby.) She was given this information by a long standing friend. In fact, as that friend testified, and as the natural mother learned when she decided to revoke her consent, these were lies. The nun had made no recommendation about the couple, and the couple lived in the same borough as the natural mother. Although the friend had only been motivated by a desire to assist her, nonetheless, it is not at all certain that without the lies she would have given her consent.

In *Singer Adoption Case*, 457 Pa. 518, 326 A.2d 275 (1974), the court was faced with a situation somewhat similar to that presented in the present case. In that case the court determined that a conditional relinquishment does not amount to the requisite unequivocal consent to adoption.

The record clearly indicates that from the time that he first agreed to an adoption in the amendment to the New Jersey divorce decree, Singer never intended to give up his parental rights. Although his signature did appear on the unconditional consent form, it was nevertheless conditioned upon the retention of these rights. Mr. Forbes' testimony regarding the conversations and understandings of the parties on September 3, 1972, at the signing of the unconditional consent form indicates that *but for* his assurance that he would continue Singer's rights on a goodwill basis, Singer would not have consented to the adoption. "Q. And is your answer to the

question, then [that you admit that] after May of 1972 he did not change his position with regard to preserving those rights [under the New Jersey divorce decree], is that correct? A. That is correct. Q. Even at the time on September 3rd, 1972, when you showed him [the new form of] consent, he brought up the matter of those rights not being incorporated in this consent, isn't that correct? A. That is correct. Q. And did you assure him at that time that the rights would be preserved privately, as between you and him, if he would sign the consent? . . . A. It was my intention at that time to consent, to follow the Court Order in New Jersey. . . . I told him we intended to follow those. Q. Did you assure him that he was not giving up those rights? A. No, I did not. In fact, I told him just to the contrary, there was no legal way to enforce this right, and that he would have to rely on our good will and our good relations we had until that time. Q. But you assured [him] that he would have those rights, however, relying upon your good will to obtain them? A. That is right."

The problem is that the preservation of these rights, even through an informal agreement, or on a goodwill basis, conflicts with the incident of complete control and custody of an adopted child by an adopting parent as contemplated by law. We cannot say that a consent conditioned upon the preservation of certain rights with respect to the child is sufficient to effectively establish the statutorily required consent. The severance of natural ties occasioned by adoption is of such obvious finality as to demand clear and unequivocal consent by a natural parent and we believe that Singer's consent here was insufficient.

*Id*. at 523-24, 326 A.2d at 278.

In the present case the parents were forced to make a quick decision in the courthouse hallway shortly before the hearing in the action to terminate their parental rights was to commence. The parents were told that the court would most likely terminate their rights. The chance that they would be able to see their son through an "open adoption" was an attractive inducement to sign the relinquishment and abandon their contest of the termination proceedings. Under the

circumstances in this case we conclude that the McCormicks were coerced into signing the relinquishment. A relinquishment conditioned upon the retention of some parental rights is invalid.

"[T]here remains the question that is present in every habeas corpus case involving child custody: the best interests of the child." *Gray v. Maxwell*, 206 Neb. 385, 394, 293 N.W.2d 90, 96 (1980). The juvenile court has retained jurisdiction to determine the best interests of the child. The plaintiffs' right to custody of their son is subject to further proceedings in the separate juvenile court.

The judgment is reversed and the cause remanded with directions to enter judgment in conformity with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

HASTINGS, J., dissenting.

As stated in the majority opinion, although we review a decision in a habeas corpus case involving custody of a child de novo on the record, we will give great weight to the findings of the trial court where the evidence is in irreconcilable conflict. *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980). In my view, we have failed to accord that consideration to the district court in this instance.

The record fully supports the decision of the trial court. However, by this decision we have permitted the credibility and the integrity of the judicial process to become suspect by the second-thought, self-serving statements of parties to the action. I would affirm the judgment of the district court.

I am authorized to state that BOSLAUGH, J., and COLWELL, D.J., Retired, join in this dissent.