MARY JANE AUMAN, NATURAL MOTHER OF ANN MARIE AUMAN, APPELLANT, V. CAROL ANN TOOMEY AND MICHAEL J. TOOMEY, APPELLEES.

368 N.W.2d 459

Filed May 24, 1985.   No. 84-741.

Laureen Van Norman, for appellant.

Craig D. Wittstruck of Berry, Anderson, Creager & Wittstruck, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

On May 1, 1984, the petitioner, Mary Jane Auman, executed and delivered a written relinquishment and consent to the adoption of her daughter, Ann Marie, by the respondents, Carol Ann Toomey and Michael J. Toomey. The child has been in the custody of the respondents since that date.

On May 18, 1984, the petitioner executed a written revocation of the relinquishment and commenced this proceeding on June 14, 1984, for a writ of habeas corpus to obtain custody of the child. The trial court found that the relinquishment and consent to adoption executed by the petitioner was valid and that it was in the best interests of the child that she remain in the custody of the respondents, and dismissed the petition. The petitioner has appealed.

The issue presented by the petitioner is whether the relinquishment and consent to adoption she executed was valid.

The record shows that on April 30, 1984, the petitioner contacted an attorney, Clay Statmore, and made an appointment for the next day to discuss adoption procedures for the child, who was then 22 months old. Statmore informed her he represented a couple interested in adopting a child.

On May 1, 1984, the petitioner and the child's natural father, Scott Squires, met with Statmore on two occasions. At the morning meeting Statmore informed them he could not represent them in this matter and that they had a right to speak to an attorney. He asked them if they wanted to adopt out their child. Squires said they had been thinking about it for a year and a half. When asked, neither was interested in temporarily

placing the child with relatives, as the responsibility for caring for her would still be with them.

After gathering all the necessary information, Statmore told them he would contact them later that afternoon after checking with the prospective adoptive parents. He informed them that once they signed the relinquishment, it would be final. Up until that point they could change their minds.

That afternoon the couple met again with Statmore and his associate, Dana London. Statmore repeated several times that he did not represent them, that signing the document relinquished all of their rights to the child, and that it was final and irrevocable. He also advised them of the availability of temporary foster care and of their right to an attorney. Both the petitioner and Squires read the relinquishment, had no questions, and signed the documents. The relinquishment was witnessed by Dana London and acknowledged before Statmore, a notary public. The petitioner then made arrangements for Statmore to collect the child and her belongings that evening. That night Statmore delivered the child to the respondents.

On May 4, 1984, the petitioner and Squires returned to Statmore's office and requested the return of their daughter. Statmore told them the relinquishment was final and that court action was the only way to recover the child. He told them they would need to get their own attorney because he represented the respondents.

On June 14, 1984, the petitioner filed this action alleging that the relinquishment and consent to adoption was involuntary and had been made under duress and, therefore, was invalid. She prayed that the custody of the child be returned to her.

At trial the petitioner testified that she relinquished her child due to personal and financial problems. Both she and Squires testified they were under the impression when they signed the relinquishment that there was a 2-week waiting period before the relinquishment would be final, during which they could get their daughter back.

A therapist who had counseled the petitioner over a period of time beginning May 9, 1984, testified that in her opinion the petitioner had impaired judgment at the time she signed the

relinquishment and was unable to correctly assess the consequences of her behavior. The petitioner's sister also testified as to the petitioner's "dazed" state on April 30.

The trial court found that the relinquishment was voluntary and valid and that it was in the best interests of the child that she remain in the custody of the respondents.

The petitioner has assigned three errors, all which center on whether the district court erred in finding the relinquishment to have been voluntarily executed and valid.

A decision in a habeas corpus case involving the custody of a child is reviewed by this court de novo on the record. Where the evidence is in irreconcilable conflict, we consider the findings of the trial court. *McCormick v. State*, 218 Neb. 338, 354 N.W.2d 160 (1984); *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980).

The burden is on a natural parent challenging the validity of a relinquishment to prove that it was not voluntarily given. *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981); *State v. Nebraska Children's Home Society*, 94 Neb. 255, 143 N.W. 203 (1913).

In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid. *McCormick, supra; Lum, supra; Kane v. United Catholic Social Services*, 187 Neb. 467, 191 N.W.2d 824 (1971). However, a relinquishment conditioned upon the retention of some parental rights is invalid. *McCormick, supra.*

Here, there is no claim that the relinquishment is facially invalid or fails to meet the statutory requirement of acknowledgment. Neb. Rev. Stat. § 43-106 (Reissue 1984).

The petitioner claims only that the relinquishment was not voluntary due to her mental incompetence at the time of signing and the impression she had that she had 2 weeks from the time of signing in which to change her mind.

At the time the relinquishment was executed, the petitioner was not married or employed. Her only source of income was ADC benefits and food stamps. She received very little support from the child's natural father because he, too, was without

work. She claims her financial stress at the time rendered her incompetent to make the decision to relinquish her child. The stresses, motivation, and circumstances that were present in this case are present in many such cases and do not form a basis for revocation. See *Kane, supra*.

Here, the evidence discloses the decision to relinquish was made by the petitioner herself without outside influence or pressure from anyone. She had thought about relinquishing the child for adoption since the time of her birth. She initiated the proceedings by contacting Statmore and setting up the initial appointment. She did not discuss her intention to relinquish the child for adoption with her parents, who in fact were against the idea. She only informed Squires of the appointment after she had made it.

At the meetings with Statmore she was coherent and participated actively in the conversation. She understood the finality of the relinquishment and declined advice that she needed an attorney. She rejected the suggestions of alternate placement as unworkable. She signed the document only after reading it. She rejected Statmore's final offer to destroy the document after signing, if she was unsure of relinquishing the child. She then made the arrangement for delivering the child to Statmore that evening. The procedure used by Statmore was informative and proper, and his testimony was corroborated by his associate, London.

The evidence indicates the petitioner changed her mind and succumbed to the influence of relatives only *after* the relinquishment had been signed. A change of attitude subsequent to signing a relinquishment is insufficient to invalidate it. See *Batt v. Nebraska Children's Home Society*, 185 Neb. 124, 174 N.W.2d 88 (1970).

After the relinquishment had been executed, the petitioner's parents voiced their opposition and attempted to regain custody of the child on their own. Squires' parents offered to take the child for 5 years to allow the couple to work out their problems. Prompted by their parents, the petitioner and Squires approached Statmore the second time to revoke the relinquishment. During this meeting, the petitioner uttered but one word and was silent while Squires stated his intent to try

and regain custody.

The petitioner's claim that the relinquishment had been obtained by misleading them into believing they had a 2-week waiting period is not supported by the record.

Both Mary Jane and Squires had vague recollections that Statmore mentioned a 2-week waiting period during the afternoon session on May 1. However, neither was able to recall exactly what Statmore had said in that regard. Further, neither Statmore's testimony nor that of his associate made mention of a 2-week waiting period. In light of the petitioner's admission that she understood the relinquishment was final, this claim is without merit.

When the record is considered as a whole, the evidence is insufficient to prove that the petitioner was coerced or misled into signing the relinquishment or that it was unintelligently or involuntarily made.

The remaining question is what is in the best interests of the child. *McCormick v. State*, 218 Neb. 338, 354 N.W.2d 160 (1984); *Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980).

The burden remains with the petitioner to show that the best interests of the child *require* that the custody of the child be returned to her natural parents. *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981). Since the relinquishment was valid, the natural parents lose any superior rights they may have to custody, and stand on equal footing with the prospective adoptive parents. *Lum, supra.*

There is no evidence to suggest that the respondents are unfit to have custody of the child. In fact, the testimony reveals the child is happy and well adjusted. She refers to the respondents as "Mom" and "Daddy" and has progressed both physically and mentally. There is no evidence to support a finding that the child's interests would be best served by uprooting her after approximately a year in her present environment. See *Lum, supra.*

The judgment of the district court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

It is said that consistency is the hobgoblin of small minds. While it is not my desire to run with the hobgoblins,

nevertheless I do believe that consistency in this case is desirable. For reasons more fully set out in my dissent in *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981), I likewise dissent in this case. Perhaps the solution to the problem and the apparent inconsistency lies with the Legislature. The inconsistent position we have created between licensed agencies on the one hand and private placement on the other does not, in my view, make much sense either legally or as a matter of policy.