TAMARA J. GAUGHAN AND JEFFREY UBER, APPELLEES, v. TOMMY
GILLIAM AND SAMIE GILLIAM, APPELLANTS.

401 N.W.2d 687

Filed March 6, 1987.   No. 86-205.

Craig D. Wittstruck of Berry, Anderson, Creager &
Wittstruck, for appellants.

Maureen A. Doerner, for appellee Gaughan.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE,
SHANAHAN, and GRANT, JJ.

HASTINGS, J.

This was an action for a writ of habeas corpus brought by
Tamara Gaughan and Jeffrey Uber to regain custody of their
minor child. The child had been placed for adoption with the
respondents, Tommy and Samie Gilliam, pursuant to
relinquishments and consents executed by the petitioners. The
trial court found against Jeffrey Uber because his consent was
voluntary and he did not execute a revocation within a
reasonable time. He has not filed a brief in this appeal.
However, the court did hold that Tamara Gaughan had not
executed the consent voluntarily and did act within a reasonable

time to revoke it. Therefore, the court ordered the child delivered to the custody of the petitioner, Tamara Gaughan, but directed that the order be stayed pending appeal. Respondents have appealed the court's decision.

The assignments of error are that the trial court erred in finding (1) that the relinquishment and consent was executed involuntarily, (2) that the petitioner acted within a reasonable time to revoke her consent, and (3) that the child is being unlawfully detained by the respondents.

On May 4, 1985, Tamara Gaughan, an unmarried 16-year-old living with her parents in Wichita, Kansas, gave birth to the minor child involved in this case. When the child was approximately 5 weeks old, the child, Tamara, and Jeffrey Uber, the child's father, moved to Bellevue, Nebraska, to live with Edward and Pauline Uber, the child's paternal grandparents. They lived there until approximately July 31, 1985, at which time Tamara and Jeffrey moved to their own home. The child was left with Edward and Pauline. This arrangement was a trial adoption to see if Edward and Pauline were willing to adopt the child and for Tamara and Jeffrey to see what it would be like without their child.

Shortly before August 13, 1985, Edward and Pauline decided not to adopt and informed Tamara and Jeffrey of this. Pauline Uber then contacted a friend who knew of a couple, Tommy and Samie Gilliam, who were interested in adopting. Pauline arranged a meeting at her home on or about August 13, 1985, so that Samie could meet the child.

Tamara testified that after this meeting she was very upset, so much so that she ran outside into a storm. She called her mother and told her she did not want to go through with the adoption. She also told Jeffrey that she did not want to go through with the adoption. When Pauline's friend, Girta Rogge, came upstairs to talk to Tamara, she told Tamara that a girl her age needed to go school and to proms. Tamara also testified that whenever Edward and Pauline would talk to her about adoption they kept saying that the baby needed good clothes and that he needed toys and school. They never said that he was lacking in love or attention, or asked Tamara how she felt or what she needed. Tamara, however, never told Pauline or Girta

that she did not want to go through with the adoption.

On August 22, 1985, Tamara was at Edward and Pauline's home. She was getting ready to pick Jeffrey up from work when she was told by Pauline Uber that after they picked Jeffrey up they would go to a lawyer's office regarding the adoption. Tamara testified that nothing was said to her about this meeting until right before they went to it and that she would not have gone to the lawyer's office if it had not been for Pauline. Pauline testified that Tamara knew there was going to be an appointment but did not know the exact date.

The lawyer involved, Douglas Veith, testified that he telephoned Tamara on August 21, 1985, to get the information he needed to prepare the relinquishment and consent forms. When he told her who he was, she said that she wanted to talk to her mother. Douglas Veith said he encouraged her to talk to her mother and that he was not pressuring her at all. He said the conversation was left that he would prepare the documents and that when they made their decision to adopt, they would come into his office.

Tamara denied ever receiving such a telephone call. Veith testified that he made a similar telephone call to Jeffrey, which Jeffrey acknowledged receiving.

Douglas Veith testified that when Tamara, Jeffrey, and Pauline arrived at his office on August 22, 1985, he showed them into his personal office, introduced himself, and explained that he was the attorney for Tommy and Samie Gilliam and that he did not get into people changing their minds concerning parental rights. He then advised them that execution of the consent forms would terminate all parental rights, that they would have no right to come back and reclaim the child, that they could no longer come back and find out about the child, and that the decision was serious and to be made solely by the child's natural parents.

Tamara, on the other hand, testified that she was never advised there were alternatives to adoption such as foster care, that the relinquishment forms were never explained to her, and that she did not understand she would never see her child again. Jeffrey also testified that Veith did not go into detail explaining anything about the relinquishment and adoption process.

Veith then testified that after he told them about the process he gave the documents to Tamara and Jeffrey and advised them to read them and to talk about the process while he left the room for a few minutes. When he returned to his office with a witness, Van Schroeder, Jeffrey had already signed the forms. Schroeder refused to witness the signature, so Veith had the forms reaccomplished. Then, both Jeffrey and Tamara signed the forms in the presence of Veith and Schroeder.

Contrary to Veith's testimony, Tamara and Jeffrey testified that Schroeder did not see Jeffrey sign the relinquishment and consent forms. It was uncontroverted that Schroeder did see Tamara sign her forms and that Tamara only partially signed her name and then stopped signing. When Pauline Uber put her hand on Tamara's shoulder and told her it was best for the child, Tamara finished her signature. Tamara testified that she felt pressured into making a decision.

That evening Pauline took the baby to Girta Rogge's home and the Gilliams received the baby.

"A decision in a habeas corpus case involving the custody of a child is reviewed by this court de novo on the record. Where the evidence is in irreconcilable conflict, we consider the findings of the trial court." *Auman v. Toomey*, 220 Neb. 70, 73, 368 N.W.2d 459, 461 (1985).

"The burden is on a natural parent challenging the validity of a relinquishment to prove that it was not voluntarily given." *Id*.

"In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid." *Id*.

In this case, Tamara Gaughan signed the relinquishment and consent form on August 22, 1985. Sometime shortly after that, she and Jeffrey had a fight, after which it was decided that she should get away from him for a while. She went back home to Wichita for approximately 2 weeks and then apparently returned to Bellevue.

At the end of September, Tamara's mother came up from Wichita to Bellevue to see how her daughter was doing. While she was visiting Tamara, Mrs. Gaughan went to visit an attorney, Mr. Hovey, because she was concerned about whether

Tamara should be in school. She also talked to him about whether a minor can validly relinquish the rights to her own child, to which he responded affirmatively.

The following week, on October 9, 1985, Tamara for the first time went in to see Hovey. He told her his hourly rate and half-hourly rate, which she knew she could not afford. She saved her money and then went back to Hovey sometime in November. At that time he said he needed a retainer, the names and present address of the prospective adoptive parents, and the relinquishment papers.

Tamara contacted the attorney who handled the adoption for a copy of the relinquishment documents and was refused. Tamara then went back to Hovey, and he suggested that she contact Legal Aid, which she did. Tamara signed a revocation of relinquishment and consent to adoption form on December 13, 1985. A copy of this document was sent to the attorney handling the adoption. In an attempt to learn the Gilliams' names, Tamara contacted their church pastor, but he would not tell her their names. Finally, on December 30, 1985, she did learn their names. This action for a writ of habeas corpus was filed on January 2, 1986.

The very nature of the act of a mother in relinquishing her child for adoption is emotionally traumatic. However, the mere fact that a mother in a situation such as this might be influenced by the real concern expressed by friends or family for the welfare of both the mother and the child does not mean that such act of relinquishment is the product of threats, coercion, fraud, or duress. We do not think that the record in this case supports such a finding. From our review of the record de novo, we determine that the relinquishment and consent was voluntarily executed by the petitioner, and she has failed to meet her burden of proof to establish the contrary. That she may have changed her mind at some time after she had relinquished the child is insufficient to invalidate the earlier consent. *Auman v. Toomey, supra.* Having determined that the relinquishment was voluntary, it is not necessary for us to consider the question of the timeliness of its attempted revocation.

The remaining question present in every habeas corpus case is the welfare and best interests of the child. *Auman v. Toomey,*

*supra*. The record is crystal clear that the best interests of the child would be served by allowing the child to remain with the respondents. The testimony of the respondents and of Gene Welch, a psychotherapist who visited the home of the respondents and observed the interactions between them and the child, leaves no basis to conclude that the respondents are unfit to have custody of the child. To the contrary, to uproot this child after approximately a year and a half in his present environment could be seen as nothing but detrimental to his future development. The statement by the trial judge as he announced his oral findings would support such a conclusion.

The judgment of the district court is reversed and remanded with directions to enter judgment consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

KRIVOSHA, C.J., dissenting.

For reasons more fully set out in my dissent in *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981), and my dissent in *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985), I must likewise dissent in this case.

The hazard which I feared for in *Lum v. Mattley, supra*, did in fact occur in some part in the instant case. The first couple to whom the child was given declined to adopt the child. Had there not been a second couple already in the wings, our decision would stand for the proposition that while the natural mother has lost her rights to the child, the child has acquired no adoptive parents and now becomes a ward of the state. In the case of a licensed agency we would not permit such a situation to arise. See *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981). One may argue that the distinction between the licensed agency and the private placement is the language of the statute. Nevertheless, in *Kellie v. Lutheran Family & Social Service, supra* at 772, 305 N.W.2d at 877, we said, "Basic principles of offer and acceptance, as well as the statute, dictate that result." I believe that basic principles of offer and acceptance, of mutuality, and of the law regarding contracts, generally, should apply in the case of private placement as well as that of licensed agencies.

In the instant case a near disaster was avoided only because another couple was available. For a host of reasons, that may

not always be the case; yet the rule of law will prevail. I would have supported the action of the district court and affirmed its judgment.