DARLENE HOHNDORF, APPELLANT, V. ALAN WATSON AND
NEBRASKA CHRISTIAN SERVICES, A NEBRASKA CORPORATION,
APPELLEES.

482 N.W.2d 241

Filed March 27, 1992.    No. S-91-544.

David A. Christensen, of Christensen & Phillips, P.C., for appellant.

Deborah D. McLarney, of Erickson & Sederstrom, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Darlene Hohndorf, an unwed mother, appeals from the district court's denial of her petition for a writ of habeas corpus seeking recovery of the custody of her newborn child. She assigns three errors, which may be summarized as contending that the trial court erred in determining the relinquishment for adoption signed by petitioner was valid; was executed voluntarily, knowingly, and intelligently; and was not procured by fraud. We affirm.

Respondent-appellee Alan Watson is an agency director and a caseworker for respondent-appellee Nebraska Christian Services (NCS), an adoption agency licensed under Nebraska

law. See Neb. Rev. Stat. § 43-701 (Reissue 1988). On November 1, 1990, petitioner visited Watson at his office. She was accompanied by a friend, La Donna Cole. This was the only meeting attended by Cole.

During the November 1 meeting, petitioner told Watson that she was 5 months' pregnant and that she wanted to place her child for adoption after the child was born. Petitioner told Watson that she was financially unable to keep the child and that she did not have support from her family.

Petitioner and Cole both testified that Watson told petitioner she would have 6 months to change her mind after she signed the relinquishment documents. Petitioner testified that Watson mentioned the 6-month period at least three times at the initial meeting, but that she did not think it was important. Cole testified that she was frustrated because she felt Watson was trying to talk petitioner out of placing the child for adoption.

Watson testified that he did not make any statements to petitioner or Cole regarding petitioner's having a period of 6 months to change her mind about relinquishing the child and that he had never made such statements during his 4 years at NCS. He testified that he did tell her that "the baby is in the agency's custody after she relinquishes, and then six months later the adoptive parents finalize the adoption." Both petitioner and Watson testified that the 6-month timeframe was never mentioned again in later meetings between the two.

At the first meeting, Watson testified, they generally discussed the relinquishment document and the affidavits. He testified that NCS has affidavits the mothers sign in connection with adoption. No documents were executed at that initial meeting, but Watson testified that he showed petitioner all the documents she ultimately signed and that they went over the documents in detail at the initial meeting. He said that he explained the effect of the documents and that petitioner said she understood the forms. Watson testified that he made the point that once the papers were signed, the baby was no longer the mother's baby, but was NCS' baby.

Petitioner testified that Watson did not show her any documents at the initial meeting, although he did tell her she would need to sign various documents. She testified she did not

remember specifically what Watson said about the documents. She did testify, however, that Watson showed her some papers at some point after the initial meeting, but he did not read them to her. Cole, on the other hand, testified that Watson showed petitioner and Cole several documents at the initial meeting, including "profiles on prospective parents or an example of one [profile]" and that Watson said petitioner "would be able to actively participate in choosing those [parents] so she would be comfortable and know her child had a good home." Petitioner did not testify to any such documents or conversation.

After the initial meeting, petitioner met with Watson in his office nine more times. Watson testified the forms were also discussed at one of the subsequent meetings. He stated that petitioner never indicated any doubt about placing the baby for adoption.

The child was born March 10, 1991, at 3 a.m. Petitioner called NCS in the afternoon on March 10 and told the agency that the baby had been born. On March 11, Watson visited petitioner at the hospital. Watson testified that petitioner was very tired and that she had the baby with her, but told him it was the first time that she had seen the child. Watson testified that they discussed only petitioner's health and that he did not stay very long.

Watson met with petitioner again the next day, March 12, at approximately 11:20 a.m. Petitioner signed the forms that day with Scott A. Bruner, the hospital patient financial counselor, present, as well as a hospital nurse who served as a witness. Watson testified that while Bruner was out of the room searching for someone to serve as a witness, he went over each form with petitioner, although he did not read them all aloud to her. Petitioner testified that Watson "briefly explained to me what the papers were when I signed them" and that Watson's explanation included telling her that one document gave the agency custody of the child. Watson testified that while they were waiting for Bruner, petitioner read the forms again. Petitioner also testified that "I did not read through all of them very carefully. I did read through two of them, and the third I don't remember very well."

Petitioner signed the "Relinquishment and Consent to

Adoption" form, which contained the following language:

> Now I, Darlene Hohndorf, the mother of said child, do hereby voluntarily relinquish to [NCS] all rights to and custody of and power and control over said child and all claim and interest in and to [the child] . . . to the end that the [NCS] may become the legal guardian of said child and do hereby authorize the said [NCS] to place said child with any person deemed suitable by said Institute for adoption . . . to a suitable person, family, or institution for temporary or permanent care, and I do hereby authorize said [NCS] to consent to such adoption without any further notice to me.

The relinquishment was signed by petitioner, witnessed by the nurse, and notarized by Bruner.

In addition, petitioner signed an affidavit which stated that she was aware of the alternatives to adoption, that she was placing her child for adoption, and that "[s]he understands that her signature on the Relinquishment and Consent to Adoption indicates her understanding that this is a permanent decision and cannot be revoked." This affidavit was notarized by Bruner and witnessed by Watson. When asked what she thought that language meant, petitioner replied, "I just thought that it meant that the agency would . . . proceed to have custody of her, but I still in my mind, I thought I had that six months to change my mind." Petitioner testified that she knew what the words "revoked" and "permanent" mean, that she did not have any questions about the documents at the time she signed them, and that the documents seemed "simple."

This affidavit also set out, in part, that petitioner acknowledged she was a client of NCS, that she requested NCS place her newborn child for adoption, and that petitioner was aware of the various alternatives and community resources for the child, such as temporary foster care and the availability of certain benefits. Attached to this affidavit was a four-page "Nebraska Adoption Medical History, (Birth Mother)." The affidavit also set out the name of the putative father. The putative father executed similar forms on March 14, 1991.

The nurse who witnessed the "Relinquishment and Consent to Adoption" testified that Bruner asked petitioner if she

understood a document she was to sign. The nurse testified that petitioner said she understood, that petitioner read the document over out loud, and that Bruner again asked her if she understood. Petitioner again responded that she did. Bruner then notarized the relinquishment.

A second affidavit, signed by petitioner and notarized by Bruner, set out that petitioner had been shown a "nonconsent form" and that by signing the affidavit, petitioner understood she consented to the release of "the adoptive person's records to the adoptive person." See Neb. Rev. Stat. § 43-143 (Reissue 1988).

The third affidavit signed by petitioner was a "Direction to Deliver Custody of Child" and was also notarized by Bruner. Bruner testified that he told petitioner this was not a relinquishment and that it only gave the hospital permission to allow Watson to leave the hospital with the baby. Bruner stated that petitioner said she understood and that she signed the document voluntarily.

Watson testified that petitioner's sister called him on March 14 and stated that petitioner wanted her baby back. Watson then telephoned petitioner, who confirmed what her sister had said. Watson testified he received a letter and a "Revocation of Relinquishment" signed by petitioner, both dated March 26, 1991, from petitioner's attorney. The revocation provided: "I hereby revoke my Relinquishment of Parental Rights and Consent to Adoption, signed approximately August, 1985."

We have held that a decision in a habeas corpus case involving the custody of a child is reviewed by an appellate court de novo on the record, and in that de novo review, where the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990); *D.S. v. United Catholic Soc. Servs.*, 227 Neb. 654, 419 N.W.2d 531 (1988).

We have also held that the burden is on the natural parent challenging the validity of a relinquishment to prove that the relinquishment was not voluntarily given. *Hensman v. Parsons, supra; Gaughan v. Gilliam*, 224 Neb. 836, 401 N.W.2d

687 (1987). Further, in the absence of fraud, coercion, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid. *Hensman v. Parsons, supra*; *Gaughan v. Gilliam, supra*; *Yopp v. Batt*, 237 Neb. 779, 467 N.W.2d 868 (1991).

In *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985), we considered a similar case. In that case, petitioner contended that her relinquishment was invalid because of her mental incompetence, caused by financial stress, and her impression that she had 2 weeks after the relinquishment to change her mind. The petitioner testified she had a vague memory of the attorney who handled the adoption making some statement during their second meeting about a 2-week waiting period, but the attorney and his associate denied making such a statement. We stated: "The evidence indicates the petitioner changed her mind and succumbed to the influence of relatives only *after* the relinquishment had been signed. A change of attitude subsequent to signing a relinquishment is insufficient to invalidate it." *Auman*, 220 Neb. at 74, 368 N.W.2d at 462.

In the situation before us, the evidence is in irreconcilable conflict. Petitioner and Cole testified that Watson told them petitioner would have 6 months to change her mind after the relinquishment. Watson testified that he did not make such a statement. The trial court accepted Watson's testimony. After a careful review of the entire record, in our de novo review, so do we.

AFFIRMED.