insured. In the present action, the allegations of the complaint support a conclusion that the damage to the home was caused by faulty workmanship or a similar impropriety in Cizek's performance. According to *Auto-Owners Ins. Co. v. Home Pride Cos., supra*, this does not constitute an "occurrence" under the terms of the policy. While Cizek denied that it was negligent, no facts were presented that would support an inference that the damage was caused by an occurrence. Therefore, the district court erred when it determined that Columbia had a duty to indemnify Cizek for the costs incurred in repairing the Riekeses' home.

[9] Having determined that there was no occurrence, there can be no initial grant of coverage under the policy; therefore, it is unnecessary to address the application of the "Recall" exclusion. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014).

## CONCLUSION

Under the facts of this case, we find that the property damage was not caused by an occurrence; therefore, we reverse the trial court's order of summary judgment in favor of Cizek and remand the cause with directions to enter an order granting summary judgment in favor of Columbia.

Reversed and remanded with directions.

---

In re Interest of Zoey S., a child
under 18 years of age.
State of Nebraska, appellee,
v. Jesse S., appellant.
___ N.W.2d ___

Filed September 9, 2014.    No. A-13-811.

1. **Juvenile Courts: Judgments: Appeal and Error.** Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. However, when the evidence is in conflict, the appellate court will consider and

give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Proof.** The burden is on a natural parent challenging the validity of a relinquishment of parental rights to prove that it was not voluntarily given.

3. **Parental Rights.** In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights signed by a natural parent knowingly, intelligently, and voluntarily is valid.

4. ____. A change of attitude subsequent to signing a relinquishment of parental rights is insufficient to invalidate it.

5. ____. There are four requirements for a valid and effective revocation of a relinquishment of parental rights: (1) There must be a duly executed revocation of a relinquishment, (2) the revocation must be delivered to the licensed child placement agency or the Department of Health and Human Services, (3) delivery of the revocation must be within a reasonable time after execution of the relinquishment, and (4) delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child.

6. ____. Pursuant to Neb. Rev. Stat. § 43-106.01 (Reissue 2008), when a child shall have been relinquished by written instrument, as provided by Neb. Rev. Stat. §§ 43-104 and 43-106 (Reissue 2008), to the Department of Health and Human Services or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child.

Appeal from the County Court for Dodge County: Kenneth Vampola, Judge. Affirmed.

Mary Michele Ellis, of Ellis Law Office, for appellant.

Timothy E. Sopinski, Deputy Dodge County Attorney, for appellee.

Neleigh N. Boyer, Special Assistant Attorney General, of Department of Health and Human Services, for appellee.

Christina C. Boydston, for guardian ad litem.

Inbody, Chief Judge, and Irwin and Bishop, Judges.

Bishop, Judge.

Jesse S. appeals from the order of the county court for Dodge County, sitting as a juvenile court, affirming Jesse's relinquishment of his parental rights to his daughter, Zoey S. The juvenile court found that Jesse relinquished his parental

rights to Zoey through a validly executed relinquishment and that his attempt at revocation of said relinquishment was invalid. We affirm.

## BACKGROUND

Jesse is the biological father of Zoey, born in March 2006. Raquel D. is Zoey's biological mother. Jesse and Raquel never married. In March 2007, a juvenile court case commenced due to allegations that Jesse and Raquel physically abused and neglected Zoey and another child. Zoey was removed from the parental home and placed into foster care. The juvenile court case remained open until 2008.

Jesse last had contact with Zoey in 2007 after a protection order hearing in Dodge County Court where a "no-contact order" was put into place between Jesse and Raquel. In 2009, Jesse was ordered to pay child support in the amount of $50 per month. However, Jesse paid no support until November 2012. Jesse and Raquel are estranged.

On August 24, 2011, Zoey was taken into emergency protective custody and placed with the Nebraska Department of Health and Human Services (DHHS) because she had been exposed to frequent and ongoing domestic violence between Raquel and her live-in boyfriend. On August 26, the juvenile court entered an order continuing the emergency temporary custody and placement with DHHS. The juvenile court also appointed Pam Hopkins to be Zoey's guardian ad litem. DHHS placed Zoey in a foster home. The State filed a petition on September 6, alleging that Zoey was a child as defined in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). On November 2, Zoey was adjudicated pursuant to § 43-247(3)(a).

Although many pleadings, motions, and orders appear in our record, we discuss only those necessary to address the issue on appeal, i.e., those documents relating to Jesse's relinquishment of his parental rights to Zoey.

From August 2011 through October 2012, Toni Garcia, a DHHS children and family services specialist, attempted to locate Jesse. In August 2011, Garcia reviewed the "N-FOCUS database," the centralized computer system utilized by DHHS, to see if the investigating caseworker found any information

on Jesse's whereabouts, but there was no updated address. Garcia also noted that "the social service part" of DHHS had documented a couple of failed attempts to get information to Jesse. Garcia also asked Raquel more than once if she had Jesse's contact information, but Raquel did not. In December, Garcia contacted Jesse's last-known address, but was informed that he no longer lived there and had left no forwarding address or other contact information. From December 2011 to August 2012, Garcia would occasionally check DHHS' computer database to see if Jesse's contact information had been updated. In September 2012, Garcia found an address for Jesse's mother and sent her a letter requesting that she let Jesse know DHHS was trying to contact him. Jesse's mother contacted Garcia and gave her Jesse's father's address. On September 26, Garcia then sent a letter to Jesse's father asking him to have Jesse contact DHHS. On October 5, Jesse called Garcia. Jesse told Garcia that he thought his parental rights to Zoey had been terminated, but that he did want to have her. After doing some research, Garcia could find no information stating that Jesse's rights had been terminated. She arranged to meet with Jesse in November.

On November 1, 2012, Garcia met with Jesse at a library. She explained what the process would be if Jesse became involved in Zoey's case and what services would be offered to him. Garcia told Jesse she would contact him after talking to "the team" regarding a plan to start therapeutic visits between Jesse and Zoey.

Garcia invited Jesse to a family team meeting scheduled for December 28, 2012, and she also let him know about a court date on January 9, 2013.

Jesse attended the team meeting on December 28, 2012, with his father, Larry S., accompanying him. Also present at the meeting were Raquel and her counsel, the foster father, Hopkins, and Garcia. Toward the end of the meeting, Jesse said that he would relinquish his parental rights to Zoey. After waiting 30 to 40 minutes for the relinquishment paperwork to be prepared, Jesse signed the paperwork. DHHS signed its acceptance of the relinquishment that same day.

Jesse later notified the juvenile court that he did not want to relinquish his parental rights to Zoey. On January 11, 2013, the court appointed counsel to represent Jesse.

A hearing to determine the validity of Jesse's relinquishment of his parental rights to Zoey was held on June 20 and July 25, 2013.

Hopkins, Zoey's guardian ad litem, testified that at the team meeting on December 28, 2012, she advised Jesse that if he wanted to give Zoey up for adoption, he could sign relinquishment papers. Jesse said, "I just as well sign the papers, I guess I have no choice." Hopkins advised him that he did have a choice and that he had the right to an attorney. When Jesse said that he could not afford an attorney, Hopkins told Jesse that he could have the court appoint an attorney for him. According to Hopkins, Jesse said it would not make a difference. Hopkins testified that Jesse said he would sign the relinquishment papers. Although Hopkins told Jesse that she did not think it was in Zoey's "best interests for [Jesse] to resume a relationship with [Zoey] after this many years," Hopkins testified that she did not threaten Jesse or make him any promises, nor did she see anyone else make threats or promises to Jesse. Hopkins was not present when Jesse signed the relinquishment papers.

Garcia testified that during the team meeting on December 28, 2012, Hopkins asked Jesse if he would be willing to relinquish his parental rights. Although he was upset, Jesse said that he would sign the relinquishment papers for Zoey. Garcia testified that either she or Hopkins asked Jesse if he would be interested in relinquishment counseling, but he said no. After the team was dismissed, Garcia, Jesse, and Larry remained in the conference room. Garcia asked Jesse if he would like to be represented by an attorney, but Jesse stated that he wanted to move forward with signing the papers. Jesse and Larry waited 30 to 40 minutes while the relinquishment paperwork was prepared. Garcia testified that she never told Jesse that he could not leave.

Because Garcia had never taken a relinquishment before, she enlisted the help of coworker Sheena Wesch, now known

as Sheena Mikoloyck. Garcia testified that when she and Wesch returned to the conference room, Jesse was again offered relinquishment counseling and an attorney, but he declined. When Jesse said, "No matter what, you guys are going to push me out . . . ," Wesch explained to Jesse that he did not have to go forward with the relinquishment, but Jesse chose to move forward. Wesch went through the relinquishment process, going over each document and obtaining Jesse's signature. Jesse's signatures were witnessed by a notary. Garcia testified that after Jesse signed the paperwork, she prepared the acceptance letter from DHHS, got her supervisor's signature, and sent the letter by certified mail that same day. The next day (Saturday, December 29, 2012), Jesse left a voice mail for Garcia stating that he was upset. However, because it was a weekend and there was a holiday at the beginning of the workweek, Garcia did not get the voice mail until she had already received the certified mail receipt that Jesse signed on January 2, 2013, indicating his receipt of DHHS' letter of acceptance.

Garcia testified that during the December 28, 2012, relinquishment process, Jesse was upset, but that he listened to and acknowledged Wesch when she asked if he understood what the documents meant. Garcia testified that at no point during the team meeting or when the relinquishment was being taken did anyone threaten Jesse or force him to sign the relinquishment papers. Garcia also testified that Jesse was not pressured into signing the relinquishment. According to Garcia, Jesse said that he was signing the relinquishment because he wanted what was best for Zoey. Garcia testified that in her opinion, Jesse's relinquishment was in Zoey's best interests, because he had not had any contact with Zoey since 2007.

Wesch is a DHHS child and family services specialist. She testified that on December 28, 2012, she was informed by Garcia that Jesse wanted to relinquish his parental rights to Zoey. Because Garcia had never taken a relinquishment before, Wesch agreed to take Jesse's relinquishment and teach Garcia in the process. Wesch testified that she asked Jesse several times if he wanted an attorney (and that one could be provided to him at no cost), if he was sure he wanted to relinquish, and

if he wanted relinquishment counseling; however, he declined all offers of an attorney and relinquishment counseling, and wanted to move forward with the relinquishment.

Wesch reviewed all of the relinquishment documents with Jesse. According to Wesch, Jesse was angry, upset, and in tears, but he was cognizant and understood the purpose of the relinquishment. Wesch filled out the forms based on what Jesse said, quoting his answers on the forms. Jesse was also able to read what Wesch wrote on the forms. Wesch testified that no threats or promises were made to get Jesse to sign the relinquishment of his parental rights and that nothing caused her concern about accepting the relinquishment.

Tammy Cich is a notary public. She testified that she notarized Jesse's signatures on the relinquishment documents. Cich stated that Wesch read each document aloud to Jesse before obtaining his signature. Cich heard no threats being made toward Jesse, and she never heard Jesse say that he did not want to sign the documents. Cich testified that she would not have notarized the documents if she felt Jesse was forced or coerced into signing the documents.

Jesse testified that he has had no contact with Zoey since 2007 because he had a "no-contact order" regarding Raquel and had been told not to make contact. Jesse stated that he did not pay any child support for Zoey from 2007 to 2012 because he did not know where to send a payment or how much to send.

Jesse testified that eventually, his father called and said that he got a registered letter that Jesse was supposed to call Garcia. Jesse called Garcia immediately and arranged to meet with her. When they met at the library, Jesse asked Garcia about visits, and she said that she would get back to him. Jesse testified that after his meeting with Garcia in the library, he was under the impression that he would be reunited with Zoey and that he would get visits. He testified that no one contacted him until he got a foster care review board letter regarding a meeting in December 2012. Jesse went to that meeting, but there was no mention of starting visits.

Jesse testified that he then attended a family team meeting later in December 2012. Also present at that meeting

were his father, Raquel and her attorney, Hopkins, Garcia, a caseworker, and the foster father. The first part of the meeting related specifically to Raquel. Once that part was over, everyone left except for Jesse, his father, Hopkins, Garcia, the foster father, and one other person. Hopkins asked what Jesse wanted for Zoey, and he responded that he wanted the best for Zoey. According to Jesse, Hopkins told him that no one on his income should have children and that he needed to let Zoey go and let someone else have her. He said that Hopkins brought up the relinquishment papers and said that "these people are good people, she'd have a better life with them." Jesse said that Hopkins was very loud and "gruff." Jesse testified that Hopkins told him he would never see Zoey again and that Hopkins and Garcia kept saying he needed to sign a relinquishment so Zoey could be "adopted out." Jesse said that he "lost it" and said yes. Jesse testified that he did not want to relinquish his parental rights to Zoey, but that he was "pushed into doing it" and "forced into doing it" and that Garcia and Hopkins "badgered" him.

Jesse testified that during the 40 minutes he waited for the relinquishment paperwork, he thought that he had to stay and that things would "work out." He testified that if someone would have told him he could leave, he would have.

Jesse testified that no one asked him if he wanted an attorney. He said that when he asked if he should have an attorney, he was told that he could not afford one and that "this is going to happen anyways." Jesse testified that Garcia offered him relinquishment counseling one time during the process of signing the paperwork, but that Wesch never offered relinquishment counseling. Jesse testified that he thought Garcia asked him the relinquishment questions and that Wesch wrote down his answers, but that he was in a "daze" during the relinquishment and cried until halfway through. Jesse testified that he did not really understand what the relinquishment meant and that he felt trapped and just "wanted away from them." Jesse then testified that he did not remember if the relinquishment papers were explained to him, but that he did read the documents and understood them. Later in the cross-examination, he also admitted that when Wesch was

recording his answers on the relinquishment forms, he said that he understood that signing the relinquishment meant that he "g[o]t nothing."

Jesse testified that no one threatened him into signing the relinquishment. But he said that he was "forced" into relinquishing his rights to Zoey. Jesse testified that he felt "pressured, way, way pressured" to sign the paperwork. Jesse testified that he did not tell anyone other than Larry that he did not want to sign the relinquishment papers. When asked when he decided that the relinquishment was not a good choice, Jesse responded, "the minute I left."

Larry testified that at the meeting on December 28, 2012, "they" brought in papers for Jesse to sign, and that when Jesse asked what the papers were, he was told by Garcia that they were papers he had to sign because he was going to relinquish his parental rights. Larry testified that when Jesse told Garcia and Hopkins that he did not want to sign the papers, they said, "[W]ell, you have to sign." Larry testified that Jesse said he wanted custody of Zoey, but Hopkins "more or less told him that he would probably never see her if she had anything to do with it." Larry also testified that Hopkins said, "[I]t doesn't matter anyway whether you sign it or not, we'll just get a judge — take it to a judge and have a judge sign over on it for you." Larry testified that Garcia told Jesse that he could get a lawyer, but that Jesse said he could not afford one. Larry testified that Garcia and Hopkins kept telling Jesse to sign and that Jesse said, "[O]kay, I'll sign it, but . . . I'm signing it under duress." Larry testified that there were no threats made, but there was a lot of pressure put on Jesse, and that they were using raised voices, close to yelling.

In its order filed on September 3, 2013, the juvenile court found that Jesse relinquished his parental rights to Zoey through a validly executed relinquishment and that his attempt at revocation of said relinquishment was invalid. Jesse now appeals.

## ASSIGNMENTS OF ERROR

Jesse assigns that the juvenile court erred in finding that his "'voluntary' relinquishment was given voluntarily; given the

fact that he had no legal counsel and was led to believe he had no other legal option."

## STANDARD OF REVIEW

[1] Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013).

## ANALYSIS

*Validity of Relinquishment.*

[2,3] The burden is on a natural parent challenging the validity of a relinquishment of parental rights to prove that it was not voluntarily given. See *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985). In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights signed by a natural parent knowingly, intelligently, and voluntarily is valid. See *id*.

In his brief, Jesse contends that he had been deliberately led to believe two things: "One, that he did not have a right to legal counsel, and two, that he had no options other than to sign the paperwork presented to him." Brief for appellant at 8. Despite Jesse's testimony at the hearing that he was not offered an attorney and was forced to sign the relinquishment papers, several other witnesses testified to the contrary.

Hopkins testified that she advised Jesse that if he wanted to give Zoey up for adoption, he could sign relinquishment papers. When Jesse said, "I just as well sign the papers, I guess I have no choice," Hopkins advised him that he did have a choice and that he had the right to an attorney. When Jesse said that he could not afford an attorney, Hopkins told Jesse that he could have the court appoint an attorney for him. Garcia testified that she also asked Jesse if he would like to be represented by an attorney, but that Jesse stated he wanted to move forward with signing the papers. Garcia and Wesch both

testified that when they brought the relinquishment paperwork into the conference room, Jesse was again offered relinquishment counseling and an attorney, but he declined. When Jesse said, "No matter what, you guys are going to push me out . . . ," Wesch explained to Jesse that he did not have to go forward with the relinquishment, but Jesse chose to move forward. Wesch testified that she asked Jesse several times if he wanted an attorney (and that one could be provided to him at no cost), if he was sure he wanted to relinquish, and if he wanted relinquishment counseling; however, he declined all offers of an attorney and relinquishment counseling, and wanted to move forward with the relinquishment.

When the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Justine J. et al., supra.* The juvenile court in this case clearly chose to believe the testimony from Hopkins, Garcia, and Wesch, and we agree that their testimony was more credible. Therefore, we find unpersuasuve Jesse's arguments that he was deliberately led to believe he did not have a right to legal counsel and that he had no options other than to sign the paperwork presented to him.

Jesse also argues that he was not offered relinquishment counseling. Again, Garcia testified that either she or Hopkins asked Jesse if he would be interested in relinquishment counseling, but he said no. And Wesch testified that she asked Jesse several times if he wanted relinquishment counseling, but he declined. Even Jesse testified that Garcia offered him relinquishment counseling one time during the process of signing the paperwork. Thus, Jesse's argument that his relinquishment was not voluntary because he was not provided relinquishment counseling is unpersuasive.

The testimony of Hopkins, Garcia, and Wesch was that no one threatened Jesse or made any promises to him to get him to sign the relinquishment paperwork. Wesch reviewed all of the relinquishment documents with Jesse. According to Wesch, Jesse was angry, upset, and in tears, but he was cognizant and understood the purpose of the relinquishment. Garcia also testified that Jesse was upset, but that he listened

to and acknowledged Wesch when she asked if he understood what the relinquishment documents meant. Wesch filled out the relinquishment forms based on what Jesse said, quoting his answers on the forms. Jesse was also able to read what Wesch wrote on the forms. According to Garcia, Jesse said that he was signing the relinquishment because he wanted what was best for Zoey. Cich, the notary public, also testified that Wesch read each document aloud to Jesse before obtaining his signature. Cich heard no threats being made toward Jesse and never heard Jesse say that he did not want to sign the documents. Cich testified that she would not have notarized the documents if she felt Jesse was forced or coerced into signing the documents.

Jesse testified that he does not remember if the relinquishment papers were explained to him, but that he did read the documents and understood them. Later in the cross-examination, he also admitted that when Wesch was recording his answers on the relinquishment forms, he said that he understood that signing the relinquishment meant that he "g[o]t nothing." Jesse testified that no one threatened him into signing the relinquishment. But he said that he was "forced" into relinquishing his parental rights to Zoey. Jesse testified that he felt "pressured, way, way pressured" to sign the paperwork. Larry testified that Garcia and Hopkins kept telling Jesse to sign and that Jesse said, "[O]kay, I'll sign it, but . . . I'm signing it under duress." (This contradicts Jesse's testimony that he did not tell anyone, other than Larry, that he did not want to sign the relinquishment papers.) Larry testified that there were no threats made, but there was a lot of pressure put on Jesse, and that they were using raised voices, close to yelling. Again, the juvenile court in this case clearly chose to believe the testimony of Hopkins, Garcia, Wesch, and Cich. Upon our de novo review of the record, we agree that Jesse was not subjected to threats, coercion, fraud, or duress. Therefore, we find that his relinquishment of parental rights was made knowingly, intelligently, and voluntarily, and is valid. See *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985).

[4] Although Jesse regretted his decision to relinquish "the minute I left," his change of heart does not invalidate the relinquishment. See *id*. (change of attitude subsequent to signing relinquishment is insufficient to invalidate it).

*Attempted Revocation*.

[5] Although Jesse does not challenge the juvenile court's finding that his attempt at revocation of relinquishment was invalid, we address the issue for the sake of completeness. There are four requirements for a valid and effective revocation of a relinquishment of parental rights: (1) There must be a duly executed revocation of a relinquishment, (2) the revocation must be delivered to the licensed child placement agency or DHHS, (3) delivery of the revocation must be within a reasonable time after execution of the relinquishment, and (4) delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child. *In re Interest of Nery V. et al*., 20 Neb. App. 798, 832 N.W.2d 909 (2013). See, also, *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981).

[6] In the instant case, it does not appear that Jesse complied with the third requirement for a valid and effective revocation, i.e., that the revocation must be delivered to DHHS. The only evidence in our record is that Jesse left a voice mail for Garcia on Saturday, December 29, 2012, stating that he was very upset. There is no indication that he expressed his desire to revoke his relinquishment. Regardless of his compliance with the third requirement, Jesse clearly failed to comply with the fourth requirement for a valid and effective revocation, i.e., that delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child. Jesse relinquished his parental rights to Zoey on Friday, December 28, and DHHS signed its written acceptance of Jesse's relinquishment that same day. Therefore, Jesse's voice mail on December 29, and his subsequent notification to the juvenile court that he did not want to relinquish his parental rights to Zoey, came too late. See, *In re Interest of Nery V. et al., supra*; *Kellie v. Lutheran Family & Social Service, supra*.

See, also, Neb. Rev. Stat. § 43-106.01 (Reissue 2008) (when child shall have been relinquished by written instrument, as provided by Neb. Rev. Stat. §§ 43-104 and 43-106 (Reissue 2008), to DHHS or to licensed child placement agency and agency has, in writing, accepted full responsibility for child, "the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child"). Accordingly, Jesse's attempt at revoking his relinquishment was invalid.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's finding that Jesse relinquished his parental rights to Zoey through a validly executed relinquishment and that his attempt at revocation of said relinquishment was invalid.

AFFIRMED.